**Motion for Rehearing Denied; Affirmed; and Substitute Opinion filed March 8, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-16-00933-CV

---

### CENTRAL PETROLEUM LIMITED, Appellant

### V.

### GEOSCIENCE RESOURCE RECOVERY, LLC, Appellee

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-42477**

---

## S U B S T I T U T E   O P I N I O N

We deny appellant Central Petroleum Limited's motion for rehearing, but to address the arguments raised in that motion, we withdraw our opinion of December 14, 2017, and substitute the following in its place.

In this suit for breach of contract and related claims, defendant Central Petroleum, an Australian company, appeals the denial of its special appearance.

Because the evidence is sufficient to support the trial court's implied finding that a Central employee acting within the scope of his apparent authority executed a contract containing a Texas forum-selection clause with plaintiff Geoscience Resource Recovery, LLC ("GRR"), we conclude that the trial court has specific jurisdiction over GRR's breach-of-contract claim against Central. We further conclude that the operative facts of GRR's related quantum-meruit and fraudulent-misrepresentation claims have a substantial connection to Texas. Finally, we hold that the trial court's exercise of specific jurisdiction over all of GRR's claims against Central does not offend traditional notions of fair play and substantial justice. We accordingly affirm the trial court's denial of Central's special appearance.

## I. BACKGROUND

Central is an Australian corporation that owns approximately 70 million acres of petroleum and mineral rights in that country. Needing a farmout partner "to develop a significant portion of that acreage with a substantial drilling and seismic program," Central's then-managing director John Heugh attended the North American Prospect Expo ("NAPE") in Houston in February 2011. There Heugh met Niraj Pande, sole owner of GRR. Later that year, Central retained GRR's services in helping Central find a suitable farmout partner.

### A. The First Agreement

Central and GRR agreed in their 2011 contract that their agreement would be governed by the laws of Western Australia, and that any dispute in connection with the agreement must be settled before a sole arbitrator in Perth. GRR agreed to assist in finding a farmout partner; to assist "in negotiations relating to the documentation and the memorializing of the Transaction (*i.e.*, an agreement);" and to "provide advice to [Central] as to strategy and attend any negotiation sessions or meetings with the intent of resolving any issues and also act as an intermediary for [Central]

2

providing advice and direction on any Transactions contemplated." For these services, GRR was to be paid $10,000 (Australian dollars) per month, plus expenses. The agreement additionally provided that

> GRR may negotiate and require the potential farm-in partner[1] to pay GRR a commission fee being up to 2% of all acquisition costs and capital development costs provided directly by such potential farm-in partner in the event a farm-in is arranged. . . . [I]t is within GRR's sole and absolute discretion whether to negotiate such payment. [Central] shall have no liability or obligation whatsoever to pay any portion of any said "commission fee" payable by the potential farmin partner . . . . GRR shall from time-to-time promptly disclose to [Central] the detail and progress of any negotiations in respect to the said "commission fee", including, but not limited to, if a Transaction was likely not to proceed with a potential farm-in partner . . . because the said "commission fee" was being required to be paid to GRR.

The agreement stated that it would expire on December 31, 2011 unless the parties otherwise agreed in writing. Because GRR postponed some of its services, the agreement was extended to February 10, 2012. Well before that, however, both parties to the contract realized that no potential partner would agree to enter into a farmout agreement that required the partner to pay GRR's commission. Pande and Heugh therefore began discussing the need to amend or replace the agreement.

## B.    The Second Agreement

After the First Agreement expired, Pande emailed Heugh to ask if Center wanted GRR "to continue work desc[r]ibed in our signed agreement." Heugh answered, "Yes, until otherwise advised." Heugh then advised Pande that Central's exploration manager Trevor Shortt would be representing Central at the upcoming NAPE conference. In an email copied to Central's secretary and general counsel

---

[1]  The parties use the terms "farmout," "farm-out," "farmin," and "farm-in" interchangeably.

Daniel White, Heugh wrote to Pande and Shortt that Shortt "has been given all responsibility for farmouts, pls contact him with any enquiries." Later that day, Heugh emailed Central's chairman of the board Henry Askin and Pande, "Niraj [Pande] be aware that all farmout deals discussions promotions and negotiations are to be managed exclusively on our side by Trevor Shortt." White and at least two of Central's directors were copied on the email.

While Shortt was in Houston for the NAPE conference later that month, he and Pande allegedly negotiated the Second Agreement between Central and GRR. At Shortt's suggestion, the Second Agreement stated, "The parties agree to keep this agreement confidential and not to transmit, email, fax or discuss the contents of this agreement, particularly with John Heugh or any other parties." They agreed that GRR would continue its work and continue to draw a retainer, but because no major company would pay GRR's "success" fee, Central would pay it. The agreement required Central to present a formal agreement through its board of directors by April 15, 2012, concerning the percentage of the farmout partner's investment that would be paid to GRR as a success fee, but that if Central failed to present a formal agreement by that date, then GRR would be entitled to the success fees and retainer "that are usual and customary in the energy industry that investment banking firms and petroleum engineering firms charge for the services that GRR is providing on a gross basis." They agreed that if the farmout partner was a company that GRR had contacted independently, GRR would receive 100% of the success fee, and that if the farmout partner instead was a company that had stopped by Central's NAPE booth, GRR would receive only half of that amount. The Second Agreement stated that it would be governed by Texas law and that "any dispute will be resolved by suit either in Texas or California." After Shortt and Pande signed the Second Agreement, Shortt left with the document.

The next day, Shortt went with Pande to a meeting Pande had arranged with Total E&P New Ventures, Inc.  The meeting led to a joint venture between Central and Total E&P Activités Pétrolièrs in which, according to GRR's live pleading, Total agreed to the expenditure of $190 million (Australian dollars).  In the meantime, however, Central required GRR to cease performing services for it.  Central has not paid GRR in accordance with the Second Agreement.

GRR sued Central Petroleum, pleading claims alternatively for breach of contract, quantum meruit, and fraudulent misrepresentation.  Central filed a special appearance, which the trial court denied.  In four issues, Central challenges the trial court's denial of its special appearance.

## II. Issues Presented

Central states the following four issues for review:

1.      Did Central purposefully avail itself of Texas by twice attending NAPE, a global convention for companies seeking global partners for global exploration?

2.      Did Central purposefully avail itself of Texas by allegedly signing a contract in Texas with a Nevada company for services to be performed anywhere needed in the world?

3.      Can a trial court base specific jurisdiction on a contract allegedly signed in Texas that is lost, unsigned, unauthorized, incomplete, and bears signs of fabrication—all issues that must be resolved by a jury?

4.      Would traditional notions of fair play and substantial justice be offended by Texas courts deciding a dispute between an Australian company (doing business solely in Australia) and a Nevada entity (doing business wherever its sole employee happens to be) where (a) the parties' original contract chose Australian law and arbitration in Australia, (b) most witnesses reside in Australia and some can be compelled to attend only in Australia; (c) any judgment must be collected in Australia; and (d) trial or judgment could hamper development of millions of acres of oil and gas resources in Australia?

5

Much of Central's briefing, however, does not track its stated issues. We therefore will address the arguments we identify in Central's brief without attempting to link them to specific issues.

## III. STANDARD OF REVIEW

The existence of personal jurisdiction is a question of law, which we review de novo. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). In determining whether personal jurisdiction exists, however, the trial court may have to resolve factual disputes. *See id.* at 806 (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). Where, as here, the trial court issues no factual findings, we presume that the trial court resolved all factual disputes in favor of the judgment. *See id.* (citing *BMC Software*, 83 S.W.3d at 795). If the record includes the clerk's and reporter's records, a litigant may challenge the trial court's implied factual findings for legal and factual sufficiency. *See BMC Software*, 83 S.W.3d at 795. But, because the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony, we will not substitute our judgment for that of the trial court, even if we might reach a different answer in similar circumstances. *See Thu Thuy Huynh v. Thuy Duong Nguyen*, 180 S.W.3d 608, 615 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

## IV. GOVERNING LAW

The state long-arm statute "extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *BMC Software*, 83 S.W.3d at 795). Federal due-process requirements are satisfied if (a) the nonresident defendant has "minimum contacts" with the forum state, and (b) the court's exercise of jurisdiction "does not offend

'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Walden v. Fiore*, –U.S.–, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014)).

The principle underlying minimum-contacts analysis is that "[t]he defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *M & F Worldwide*, 512 S.W.3d at 886 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). A defendant has established minimum contacts with the forum state if it has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* (quoting *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)). When determining whether the defendant has purposefully availed itself of the privilege of conducting activities in Texas, three rules are paramount. First, only the defendant's contacts are relevant, not the unilateral activity of someone else. *See id.* (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). Second, the defendant's acts must be purposeful and not random or fortuitous. *See id.* And third, the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly consents to suit in the forum state. *Id.* (quoting *Michiana*, 168 S.W.3d at 785).

The minimum contacts sufficient to establish personal jurisdiction varies depending on whether general jurisdiction or specific jurisdiction is alleged. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) (pointing out that the burden borne by a defendant who files a special appearance is to "negate all bases of personal jurisdiction alleged by the plaintiff"). A court may exercise general jurisdiction over a nonresident defendant if the defendant's contacts with the forum state "are so 'continuous and systematic' as to render [it] essentially at home

7

in the forum State." *M & F Worldwide*, 512 S.W.3d at 885 (quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)) (alteration in original). A court may exercise specific jurisdiction if the nonresident defendant's "alleged liability arises from or is related to an activity conducted within the forum," even if the defendant's contacts with the forum state are isolated or sporadic. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)). GRR has alleged only specific jurisdiction in this case.

A single act can support specific jurisdiction as long as there is a substantial connection with the forum state. *See Phillips v. Phillips*, 826 S.W.2d 746, 748 (Tex. App.—Houston [14th Dist.] 1992, no writ). However, a single act or occasional acts may be insufficient to establish jurisdiction if the nature, quality, and circumstances surrounding their commission only create an attenuated connection with the state, diminishing the reasonable foreseeability of litigation there. *See id.* Specific jurisdiction therefore exists only if there is a "substantial connection" between the defendant's forum contacts and the operative facts of the litigation. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007).

Specific jurisdiction is established on a claim-by-claim basis unless all the asserted claims arise from the same forum contacts. *M & F Worldwide*, 512 S.W.3d at 886 (citing *Moncrief Oil*, 414 S.W.3d at 150). Central has addressed the minimum contacts related to each of GRR's causes of action separately, but has not distinguished among claims when arguing that the exercise of personal jurisdiction over Central in Texas offends traditional notions of fair play and substantial justice. We will do the same.

## V. GRR'S CONTRACT CLAIMS[2]

Central contends that because minimum-contacts analysis looks at the defendant's contacts, "the only issue is whether Central knew it was contracting with a Texas company, or *reasonably thought* it was not . . . ." Central maintains that it had no reason to expect that GRR was a Texas resident because (1) GRR was organized under the laws of Nevada; (2) GRR was not registered to do business in Texas; and (3) in its emails and correspondence with Central, GRR listed a physical address only in California. Although GRR was organized under Nevada law, GRR presented evidence that (1) its principal place of business is in Houston, (2) Central hired GRR to make use of GRR's Houston contacts, (3) Central intended GRR to partially (or even substantially) perform its work in Texas, and (4) GRR's claims arise from Central's use of GRR's Houston contacts.

We disagree, however, with Central's contention that the question of whether a court has specific jurisdiction over contract claims against a nonresident defendant turns on whether the defendant reasonably thought that the plaintiff also was a nonresident. Where, as here, the defendant is sued on a contract containing a Texas forum-selection clause, the clause operates as the defendant's consent to Texas jurisdiction. *See Michiana*, 168 S.W.3d at 792 ("Generally, a forum-selection clause operates as consent to jurisdiction in one forum . . . ."). Thus, to determine whether Central agreed to Texas jurisdiction over GRR's contract claims against it, the question to be answered is whether the trial court could or could not rely on the

---

[2] GRR's contract claims consist of its cause of action for breach of the Second Agreement and its request for declaratory relief that under the terms of the Second Agreement, "GRR is entitled to receive the industry-standard rate of 7%" on all exploration funds received, "the industry-standard rate of 5% on all follow-on development funds received," and "a 2% royalty from any production over the farm-out acreage."

Second Agreement's terms. We therefore begin by addressing Central's arguments that the trial court could not rely on the terms of the contract.

## A. The Authenticity of the Second Agreement

To avoid the Second Agreement's forum-selection clause, Central argues that the trial court could not base specific jurisdiction on the existence of the alleged Second Agreement because the question of whether Shortt in fact signed the contract is a matter for a jury to decide. In support of this contention, Central states in its brief that in *Michiana Easy Livin' Country, Inc. v. Holten*, the Texas Supreme Court "noted that basing jurisdiction on a trial judge's view of contested facts crosses the constitutional line between judges and jury." But the *Michiana* court actually said the opposite: "Personal jurisdiction is a question of law for the court, *even if it requires resolving questions of fact*." *Michiana*, 168 S.W.3d at 790–91 (emphasis added). In the cited section of *Michiana*, the Texas Supreme Court also pointed out problems that "arise if jurisdiction turns not on a defendant's contacts, but on where it '*directed* a tort,'" *id.* at 790 (emphasis added), but that language provides no support for Central's contention the trial court cannot base specific jurisdiction over a plaintiff's contract claims against a foreign defendant on the language of the contract itself if the defendant denies executing it.

Central also asserts that the statute of frauds prohibits commissions on the sale of oil-and-gas leases absent a signed writing,[3] and that the Second Agreement is "lost" and "unsigned." The assertions that "[t]here is no signed contract" and that the contract was "lost" present no jurisdictional barrier; if an original writing was lost or destroyed, then unless the proponent lost or destroyed the original in bad faith, the proponent can present other evidence of the writing's existence and content. *See*

---

[3] *See* TEX. OCC. CODE ANN. § 1101.806(c) (West Supp. 2017).

TEX. R. EVID. 1004.  GRR presented such evidence.  Pande and his then-assistant William McGinnis testified that after Shortt and Pande signed the Second Agreement, Shortt retained possession of it.  This testimony is legally sufficient to support the trial court's implied finding that Shortt executed the Second Agreement as alleged.  This evidence is not rendered factually insufficient by Shortt's verification of the conclusory statement in Central's special appearance, "There is no 2012 Contract between Central and GRR."  Notably, Shortt did not deny that he signed the Second Agreement.

In a related argument, Central contends that there is sufficient evidence to allow a jury to find that Shortt did *not* sign the Second Agreement with GRR.  *Cf.* TEX. R. EVID. 1008 (stating that in a jury trial, the jury decides whether an asserted writing ever existed).  We agree that if the evidence at trial is inconclusive, then the question of whether Shortt signed the Second Agreement can be submitted to the jury, because a trial court's resolution of facts for jurisdictional purposes does not prevent a jury from resolving the same factual disputes differently when determining the case on the merits.  *See* TEX. R. CIV. P. 120a(2) ("No determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof.").  At this point, however, we are reviewing only the trial court's jurisdictional ruling, and the standard of review requires us to presume that the trial court resolved factual disputes in favor of its judgment if it reasonably could do so.  And here, the evidence supports the trial court's implied findings that Shortt had apparent authority to, and did in fact, (1) negotiate the 2012 contract in Texas; (2) execute the contract in Texas; (3) agree that the contract is to be construed under Texas law; (4) consent to a Texas forum-selection clause; and (5) agree that GRR's compensation is to be determined in part by events in Texas,

11

such as whether a representative of Central's farmout partner stopped by Central's NAPE booth.

**B.      Shortt's Authority to Bind Central to the Second Agreement**

Central additionally maintains that Shortt had no authority to execute the Second Agreement with GRR.  Central expands on this point in its reply brief, arguing that signing the Second Agreement was beyond the scope of Shortt's authority.

In support of its position that Shortt was not authorized to execute the Second Agreement, Central cites the affidavit of its general counsel, Daniel White.  White states that only members of Central's board of directors have the authority to bind Central, and may do so only if the agreement has been approved by the board.  White further attests that Shortt was not authorized to bind the company.  Central's current managing director Richard Cottee similarly attests that "Central does not have any contract with GRR signed by [Shortt] in 2012," but "[e]ven if Shortt did sign a 2012 contract with GRR," he lacked authority to do so.

These statements by Central may be relevant to the question of whether Shortt had actual express authority, but GRR maintains that it relied on Shortt's "express, implied *and apparent authority*" in signing the Second Agreement.[4]  An agent has actual express authority when the principal intentionally makes it clear to the agent that it wants certain acts to be done, while implied authority is the agent's authority to do "whatever is reasonably necessary and proper" to carry out acts for which the agent has express authority. *Petroleum Workers Union of the Republic of Mex. v. Gomez*, 503 S.W.3d 9, 25 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Apparent authority is based on estoppel and arises if the principal either knowingly

---

[4] Emphasis added.

12

permitted the agent to hold himself as having authority or acted with such a lack ordinary care "as to clothe an agent with the indicia of authority." *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). We need address only Shortt's apparent authority.

### 1. *The evidence supports the trial court's implied finding that Central clothed Shortt with apparent authority.*

"[A]pparent authority is created by written or spoken words or conduct by the principal to a third party." *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Thus, when determining whether an agent acted with apparent authority, "only the conduct of the principal is relevant." *Gaines v. Kelly*, 235 S.W.3d 179, 182–83 (Tex. 2007). The principal's conduct establishes the agent's apparent authority if it "would lead a reasonably prudent person to believe that the agent has the authority that it purports to exercise." *NationsBank v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam) (citing *Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981)).

The conduct of the principal includes communications by Central's then-managing director John Heugh. Heugh's communications established that, at a minimum, Shortt was Central's apparent agent.

To begin with, Heugh signed Central's First Agreement with GRR, which treated GRR's commission as an issue to be negotiated as part of the farmout transaction. In that contract, Central agreed "to engage GRR to act as an advisor, enabler and facilitator in connection with [Central's] efforts to find . . . a farm-in partner for [Central's] assets in Australia . . . ." Clause 12 states, "Both parties understand that in connection with an actual or potential Transaction, GRR may negotiate and *require* the potential farm-in partner to pay GRR a commission fee of up to 2% of all acquisition and capital development costs provided directly by such

potential farm-in partner in the event a farm-in is arranged."[5]  The same clause also required GRR to inform Central if a transaction likely would not proceed because the commission "was being required to be paid to GRR."

According to both Heugh and Pande, Central and GRR realized before the First Agreement expired that any potential farmout partner would reject a deal that required it to pay GRR's fee.  The parties began discussing the need for Central to assume the responsibility to pay GRR's commission.

Approximately one day after the extended period of the First Agreement expired,[6] Heugh emailed several people that Pande would have to liaise with Central personnel to arrange their schedules.  Pande responded, "I gather from this note that [Central] wishes GRR to continue work described in our signed agreement?"  Heugh answered, "Yes, until otherwise advised."  Although GRR was "to continue work" described in the First Agreement, the parties had not yet signed an amended or replacement agreement concerning the terms on which that work was to be performed.

About two days later, and with the 2012 NAPE conference fast approaching, Heugh emailed Pande, Shortt, and White, "Trevor [Shortt] has been given all

---

[5] Emphasis added.

[6] The dates and times of emails are approximate due to the time difference between Central and GRR.  At the time of these events, Central was located in South Perth, Western Australia.  Because South Perth's time is fourteen hours ahead of Houston's time, a person with a device set to South Perth time would sometimes appear to respond to a message before the message was sent.  To reduce confusion, we have attempted, when possible, to convert to Houston time the date-and-time stamps on emails sent from devices set to South Perth time.  The result is imperfect—for example, according to the date-and-time stamps of one email thread, Heugh appears to have responded to an email from Pande more than ten hours before Pande sent it, even though Heugh was in a time zone fourteen hours ahead of Houston and sixteen hours ahead of GRR's office in Newport Beach, California.  Our goal, however, was only to clarify the order of events.  For this purpose, an approximate chronology suffices because the arrangement of email threads and the references within them indicate the order of events.

14

responsibility for farmouts, pls contact him with any enquiries." Later that same day, Heugh sent a second email to Pande, White, Central director Bill Dunmore, and Central's chairman of the board Henry Askin, stating, "Niraj [Pande] be aware that all farmout deals discussions promotions and negotiations are to be managed exclusively on our side by Trevor Shortt." No one corrected or qualified those representations.

The trial court had sufficient evidence to find that these representations would convey to a reasonably prudent person that Shortt had authority over these matters. The next question, then, is whether these matters included negotiating and executing the Second Agreement with GRR.

### 2. The evidence supports the trial court's implied finding that executing the Second Agreement was within the scope of Shortt's apparent authority.

Short's execution of the contract is binding on Central if executing the contract was within the scope of Shortt's apparent authority. *See Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 606 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *Ames*, 672 S.W.2d at 450). The scope of an agent's authority "includes only those contracts and acts incidental to the management of the particular business with which he is entrusted." *See Gaines*, 235 S.W.3d at 185. Thus, the evidence is sufficient to support the trial court's implied finding that GRR's contract to help find and negotiate with potential farmout partners was "incidental to the management of the particular business with which [Shortt] was entrusted."

The evidence satisfies that requirement. Heugh acknowledged that the First Agreement needed to be replaced or modified because no potential partner would conclude a transaction that required the partner to pay GRR's success fee. After the First Agreement expired, Heugh confirmed that Central wanted GRR to continue its

work, and that work expressly included negotiations with potential farmout partners—including the right for GRR to require a farmout partner to pay it a 2% success fee. Heugh then informed GRR that Shortt had "all responsibility" over "all farmout deals discussions promotions and negotiations." Viewed in context, these communications support the trial court's implied finding that a reasonably prudent person would believe that Central had authorized Shortt to enter into a new agreement with GRR, the company that Central had retained to "enable[] and facilitate[]" Central's efforts to conclude a farmout deal.

This is further supported by additional communications concerning the negotiation and content of the Second Agreement. We discuss these communications in chronological order.

### a. Thursday, February 23, 2012

An email sent by Shortt on or about Thursday, February 23, 2012, shows that Shortt already had begun discussing the terms of a 2012 contract with GRR and "the farmout committee" days before Shortt allegedly signed the new contract. Shortt emailed Pande what appears to be the text of an email from Shortt to Central's secretary and general counsel Daniel White:

Hi Dan

Sorry for the late reply but I wanted to discuss this with Niraj [Pande] today before replying.

Obviously with the amounts that could be involved this is above my authority so I have also cc'ed this to the farmout committee.

We are in a difficult situation with Niraj as I feel that that the original cont[r]act between [Central's managing director] John [Heugh] and Niraj [Pande of GRR] is unrealistic in that I feel there is a very low chance that the potential farm in partner will agree to pay Niraj's bill, *it will therefore fall to us to pick up the liability.*

16

I have asked Niraj to compile a complete list of Companies that he has contacted and I will add to this a complete list of companies we have contacted. *We will then sort out some sort of level of responsibility* for the amount of credit each party has to bringing each company to the table ranging from 0 to 100%.

My suggestion is that *we should then negotiate some percentage on each, but at a lower total commission than before*. Niraj has already indicated to me that he is willing to settle for less than the 2% now that I think it is much more realistic that we will do a deal. . . .[7]

Central focuses on Shortt's statement that "with the amounts that could be involved this is above my authority." But, this email reasonably can be read to mean that Shortt and Pande would negotiate GRR's percentage *of responsibility* for bringing together Central and the various potential farmout partners, but that Shortt lacked authority to negotiate the percentage of the farmout partner's investment that GRR would receive as a "success fee" if a farmout deal was reached. Such a reading is consistent with the terms of the Second Agreement: Shortt and Pande agreed that GRR would receive 50% of the success fee if the farmout partner had stopped by Central's booth at NAPE and 100% of the success fee if the farmout partner had been independently contacted by GRR. Regarding the percentage of the farmout partner's investment that would go toward the "success fee," Central's board was given a limited time to reach a formal agreement on that term because Shortt lacked authority to do so independently, but if the board failed to do so by the deadline, then the success fee would be the usual and customary percentage of a farmout partner's investment.

The email also shows that Shortt was discussing the terms with "the farmout committee," and according to Pande, Shortt later informed Pande that he was authorized to enter into the proposed contract. Although a person's representations

---

[7] Emphasis added.

are, "without more," incompetent to establish the existence or scope of the speaker's apparent authority, *see Gaines*, 235 S.W.3d at 183–84, this case contains evidence of something more, namely, Heugh's broad statements about Shortt's express, exclusive authority to manage all farmout negotiations and deals, and Heugh's instruction that GRR was to "contact [Shortt] with any enquiries." Moreover, if Shortt's oral representation to Pande that he was authorized to enter into the Second Agreement is incompetent as evidence about the scope of Shortt's authority, then so too is Shortt's representation about the scope of his authority in this email.

### b.     Friday, February 24, 2012

The next day, Shortt emailed Pande asking if they could "go through things" the next day, which would have been Saturday, February 25, 2012. Pande agreed, and said,

> I will give you all correspondence so you can make a determination on % fee you will recommend to Daniel [White] and [Central] based on GRR's involvement. I would also like to sit down with you before Monday so we can make a determination on fee schedule recommendation on those companies we are having meetings with ASAP. . . . I realize that you only have the authority to make a recommendation with respect to the issue of fees and the other minor revisions in the original agreement. I would like to sit down with you and go over those items with you that we have discussed so I can instruct my attorney to send the revised fee schedule and other minor amendments to Daniel and yourself so we can get this issue resolved.

This suggests that on Friday, February 24, 2012, GRR did not reasonably believe that Shortt had apparent authority to negotiate the Second Agreement; however, Pande testified in his deposition that Shortt told him on February 25th or 26th that Shortt had authority "to negotiate terms of the farm-out *and our agreement*."[8] In light of the broad language of Heugh's emails concerning Shortt's

---

[8] Emphasis added. The transcript records Pande as testifying that Shortt "said he had had

18

role, GRR reasonably could believe that Central authorized Shortt to describe his own authority. Pande had seen Shortt do the same thing before, with the board's knowledge, and without correction. In that earlier email, Shortt had written, "I have been appointed by the board to be directly responsible for farmouts and probably know technically more than anyone on the company on unconventional exploration. . . . I am authorized to negotiate terms for the board." A member of the board was copied on the email, and did not correct or qualify the statement.

### c.     April 10, 2012

Central contends that even after the Second Agreement allegedly was signed, GRR effectively admitted that Shortt lacked authority to bind Central to a new fee agreement. In support of this position, Central points to Pande's email of April 10, 2012, to Shortt and to Central's then-acting chief executive officer Dalton Hallgren, who replaced Heugh after Central terminated Heugh's employment in March 2012.[9] In the email, Pande wrote, "I look forward to finalizing our agreement and continuing to work together to bring viable farm-in candidates to Central

---

discussions and he *didn't* have the authority." The context, however, shows this to be a transcription error. Pande was asked, "When did [Shortt] tell you that the authority—the limited authority that you recognized in [the February 25th email] had changed?" Pande answered that it was on the 25th or 26th of February. He was then asked, "Tell me what he told you," and Pande made the statement that Shortt said he didn't have the authority. The parties understood Pande to say that Shortt said he *did* have the authority, because Central's counsel followed up by asking, "Who did he say had given him authority to negotiate a new agreement with you?" Pande answered, "Central Petroleum." Counsel then confirmed, "your sworn testimony is that Mr. Shortt had the authority to enter into a two-page agreement without any negotiation involving Mr. White. Is that what you are saying?" Pande answered, "Yes."

[9] Although Heugh's title was "managing director" and he was replaced by Hallgren in March 2012, a director's report refers to Hallgren as the acting chief executive officer rather than as the managing director. Hallgren resigned less than three months later and was replaced as chief executive officer by Richard Cottee.

19

Petroleum." Central infers from this that GRR knew there was no binding Second Agreement.

But, Central overlooks significant parts of the email that provide context to that sentence:

> *Based on our* discussions and *agreement at NAPE*, I understand that any success fee from farmout agreements with those parties who stopped by the booth at NAPE shall be 50% of whatever success fee GRR and Central Petroleum ultimately agree on for companies that were contacted prior to NAPE last month.[10]
>
> . . . .
>
> I have confirmed that the success fees are typically paid from the funds that the farm-in partner brings to the company for the assets and development. In addition, I have confirmed that a typical success fee associated with the type of transactions we are working on is between 2% to 5% for transactions less than $100 Million. I mention this only to point out that the success fees we have discussed represent a significant value to Central Petroleum. I look forward to finalizing our agreement and continuing to work together to bring viable farm-in candidates to Central Petroleum. GRR is willing to not only negotiate a fee on the low end of the scale but also perhaps below the low end.

Pande's email is consistent with the Second Agreement, which provides that Central's board can agree on the amount of GRR's success fee by April 15, 2012, but if Central fails to timely present such a formal agreement, then the success fee will be the "usual and customary" percentage of the funds that the farmout partner brings to the transaction. The Second Agreement further states that if the farmout partner is a company that GRR independently contacted, then Central shall pay GRR 100% of the success fee, but if the farmout partner is a company that stopped by Central's booth at NAPE, then Central will pay GRR 50% of the success fee.

---

[10] Emphasis added.

By sending this email referencing the parties' "agreement at NAPE," GRR reminded Shortt that time was running out for him to obtain Central's board's formal agreement to pay GRR a lower success fee than Central would have to pay if it failed to timely reach such an agreement. Whether viewed in the light most favorable to the trial court's ruling or in a neutral light, this evidence is neither an admission nor an acknowledgment that Shortt lacked authority to bind Central to the Second Agreement. Pande's April 2012 email does not detract from the evidence that, in February 2012, Central personnel who were authorized to communicate about the existence and scope of Shortt's authority made statements that would lead a reasonably prudent person to believe that Shortt was authorized to execute the Second Agreement on Central's behalf. *See NationsBank*, 922 S.W.2d at 953.

## C.    The Completeness of the Second Agreement

Central further argues that the trial court could not rely on the terms of the Second Agreement when determining whether the trial court had specific jurisdiction over GRR's contract claims because the contract is "incomplete." According to Central, the contract is "an unenforceable agreement to agree" because it does not state specifically what GRR's compensation would be.

A contract for the rendition of services is not rendered unenforceable simply because the compensation is not spelled out. Where the parties have done everything else required to create a binding agreement, "their failure to specify the price does not leave the contract so incomplete that it cannot be enforced" because "it will be presumed that a reasonable price was intended." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) (quoting *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966)). Such a presumption applies because "[t]he law favors finding agreements sufficiently definite for enforcement, 'particularly . . . where one of the

21

parties has performed his part of the contract.'" *Id*. (quoting *Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 637 (Tex. 1967)).

The Second Agreement provides that, because Central's board did not timely reach a formal agreement specifying the percentage of a farmout partner's investment that would be payable as GRR's commission, GRR's retainer and success fee instead would be the

> fee's [sic] that are usual and customary in the energy industry that investment banking firms and petroleum engineering firms charge for the services that GRR is providing on a gross basis. This will include any structure that [Central] will benefit from such as drill to earn, sharing of venture transportation facilities and gas liquefaction facilities for any farm-out.

For the purpose of our jurisdictional analysis, the contract, as a matter of law, is not unenforceable for incompleteness. GRR rendered the services it agreed to provide, so if the contract had not specified GRR's compensation, then it would be presumed that reasonable compensation was intended.

But the Second Agreement does more than that. It speaks in general terms to GRR's compensation. Contrary to Central's characterization of the document, it is not merely an agreement to agree; it states the standard against which GRR's retainer and success fee are to be measured if the parties fail to reach a further agreement. Just as a factfinder can determine an amount that constitutes "reasonable compensation," a factfinder can determine the amount of a retainer and the percentage of a farmout partner's expenditures that constitute the energy industry's usual and customary retainer and commission paid by particular types of banking and engineering firms for the services GRR provided.

22

## D.     Credibility Arguments

According to Central, the Second Agreement does not support specific jurisdiction over GRR's contract claims against Central because the document "bears signs of fabrication."  When it comes to credibility determinations, we will not substitute our judgment for that of the factfinder.  *See Thu Thuy Huynh*, 180 S.W.3d at 615.  We presume that the trial court credited the testimony of Pande and McGinnis that GRR's unsigned copy of the Second Agreement accurately represents the content of an original document that was signed and retained by Shortt.  Because that credibility determination is reasonable, we will not disturb it.

## E.     Purposeful Availment

Central presents another argument that is specific to GRR's contract claims and that overlaps with the arguments above.  Central contends that it did not purposefully avail itself of the privilege of conducting activities within Texas, thereby invoking the benefits and protections of its laws.  As we have just seen, however, the evidence supports the trial court's implied finding that Shortt acted within the scope of his apparent authority in executing a contract with a Texas forum-selection clause.  In addition, the contract contains a Texas choice-of-law clause.  Contractual forum-selection and choice-of-law clauses "cannot be ignored" when determining whether a defendant has purposefully invoked the benefits and protections of Texas law.  *See Michiana*, 168 S.W.3d at 792.  Thus, the evidence supports the trial court's implied finding that Central invoked the benefits and protections of Texas law.

## F.     Conclusion

To summarize, we hold that, as a legal matter, specific jurisdiction can be based on a contract that was negotiated, signed, and relied upon in Texas and that

contains Texas forum-selection and choice-of-law provisions. We further conclude that, as a factual matter, and for jurisdictional purposes only, the evidence supports the trial court's implied finding that Shortt had apparent authority to sign the Second Agreement and did in fact sign it.

## VI. THE REMAINING CLAIMS

Regarding GRR's tort claims for quantum meruit and fraudulent misrepresentation, the Texas long-arm statute authorizes the exercise of personal jurisdiction over a defendant who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2) (West 2015). But as previously mentioned, specific jurisdiction exists only if there is a "substantial connection" between the defendant's forum contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. When analyzing Central's arguments concerning GRR's tort claims, we accordingly begin by identifying the elements of each of claim and determining whether there is a substantial connection between Central's Texas contacts and the operative facts that must be proved to establish the claim.

### A. Quantum Meruit

To prevail on a quantum meruit claim, a plaintiff must establish that the defendant accepted valuable materials or services furnished by the plaintiff under circumstances that reasonably notified the defendant that the plaintiff expected to be paid by the defendant. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Moreover, it is well-established that if a contract is unenforceable due to a signatory's lack of authority to bind the principal, the other party to the contract nevertheless may recover in quantum meruit the reasonable value of the services rendered to the principal. *See Colbert v. Dall. Joint Stock Land Bank of Dall.*, 129 Tex. 235, 241, 102 S.W.2d 1031, 1034 (1937); *Henrietta Nat'l Bank v. Barrett*, 25 S.W. 456, 457 (Tex. Civ. App.—Fort Worth 1894, writ ref'd).

24

Thus, one set of operative facts that would establish GRR's quantum meruit claim would be those showing that (1) GRR rendered valuable services to Central, (2) Central accepted GRR's services knowing that GRR expected Central to pay its success fee, (3) Shortt executed the Second Agreement despite the absence of authority to do so, (4) GRR relied on the Second Agreement by introducing Central to Total and by refraining from mentioning the First Agreement's provision permitting GRR to require Central's farmout partner to pay its success fee.[11]

There is a substantial connection between the operative facts of the quantum meruit claim and Central's Texas contacts. GRR alleges that it rendered valuable service to Central in Texas by arranging for Shortt to meet with Total, and Central accepted that service knowing that GRR expected Central to pay for GRR's work. This is supported by evidence that Shortt and GRR negotiated and executed the Second Agreement in Texas, and the contract's terms communicated to Central that GRR expected Central to pay for GRR's services in accordance with industry standards unless the board reached a different agreement by April 15, 2012. After Pande and Shortt discussed the Second Agreement, Central acknowledged GRR's expectation that Central would pay GRR's commission if GRR was not paid by the farmout partner. This is shown by Heugh's email to other Central personnel in which he stated that "in good faith, we have agreed that we would make some form of ex gratia payment and we must comply if GRR ha[s] played a material role and he does not get a commission from the farminees that he may have introduced." Shortt further stated to other Central personnel that GRR "seems to want to push changes removing the mights and maybe's," a statement that refers to Shortt's and Pande's

---

[11] A plaintiff can prevail on a quantum meruit claim without proving that a contract was signed on the defendant's behalf by a person who was not authorized to do so. We use this as an example because in alleging its various causes of action, GRR incorporated its factual allegations, including the allegation that Shortt signed the Second Agreement.

25

discussions in Texas about the Second Agreement, which would change an "ex gratia" payment into a firm obligation. Pande also testified that Shortt informed him in Texas that he had authority to sign the Second Agreement. Pande then relied on the Second Agreement the next day in introducing Shortt to Total E&P New Venture's CEO in Texas and in refraining from mentioning the First Agreement's provision allowing GRR to require a farmout partner to pay GRR's success fee. GRR's introduction of Central to Total in Texas culminated in a successful farmout agreement.

Given these circumstances, the evidence supports the trial court's implied findings, for jurisdictional purposes only, that Shortt represented in Texas that he had authority to execute the contract; that he did in fact execute it in Texas; that Shortt did so to induce GRR to follow through on the meetings scheduled to take place in Texas on the following day; that GRR did rely on the Second Agreement by performing the introductions without requiring Total to pay GRR's success fee; and that GRR has been harmed thereby, because neither party has paid its success fee. Although Shortt required GRR to include a confidentiality provision in the agreement, Central was aware both before and after the Second Agreement allegedly was signed that GRR was rendering its services in the expectation that Central would pay its success fee, as Shortt essentially acknowledged in his email to Pande containing the text of an email to Central's counsel. We therefore hold that the trial court did not err in determining that there is a substantial connection between the operative facts of GRR's quantum meruit claim and Central's contacts with Texas.

## B. Fraudulent Misrepresentation

A plaintiff asserting a claim for fraudulent misrepresentation must prove the following elements of the tort: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it

was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the plaintiff act upon it; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff thereby suffered injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). For the purpose of the fraudulent-misrepresentation claim, the operative facts would be those showing that (1) Shortt represented that he had authority to execute the Second Agreement and that Central would pay GRR's success fee, (2) at least one of these representations was false when made, (3) Shortt made the false representation knowingly or recklessly, (4) GRR relied on the false representation, and (5) GRR was injured by that reliance.

Central admits that making false representations in Texas can support the existence of specific jurisdiction "but making false representations *from abroad* that are heard in Texas cannot." GRR, however, has alleged that Central "falsely represented to GRR in Texas that it would pay GRR the usual and customary success fee." The "usual and customary" language is drawn from the Second Agreement which allegedly was negotiated, signed, and relied upon in Texas. We therefore understand GRR to allege that the tort was committed in Texas.

Our analysis of the court's specific jurisdiction over GRR's fraudulent-misrepresentation claim against Central parallels our analysis of the trial court's jurisdiction over GRR's quantum meruit claim. There is evidence that GRR wanted a written commitment that Central would pay GRR's success fee, and that Shortt represented that he had authority to sign the contract and did in fact sign it so as to induce GRR to complete the Texas introductions the next day without mentioning the First Agreement's provision allowing GRR to require the farmout partner to pay GRR's success fee. The pleadings and the evidence indicate that the events alleged would have taken place in Texas, and for the purpose of inducing GRR to act in

27

reliance on the agreement in Texas. The trial court therefore did not err in impliedly finding that there is a substantial connection between the operative facts of the fraudulent-misrepresentation claim and Texas. *See Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 77–78 (Tex. 2016) (affirming the trial court's exercise of specific jurisdiction over a fraudulent-misrepresentation claim where the allegations and evidence supported a finding that the defendant had actual and apparent authority to conduct negotiations in Texas and the plaintiff alleged that the misrepresentations were made during those negotiations).

## VII. FAIR PLAY AND SUBSTANTIAL JUSTICE

Finally, Central contends that the trial court's exercise of jurisdiction offends traditional notions of fair play and substantial justice. In determining whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, we consider the following factors to the extent it is appropriate to do so: (a) the burden on the defendant, (b) the forum state's interests in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (e) the shared interest of the several states in furthering fundamental substantive social policies. *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 55 (Tex. 2016), *cert. denied*, 137 S. Ct. 2290, 198 L. Ed. 2d 724 (2017) (citing *Moncrief Oil*, 414 S.W.3d at 155). When the defendant is haled into court from a foreign nation, we consider more specifically (f) the burden on the defendant that must defend itself in a foreign legal system, (g) the state's regulatory interests, and (h) "the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies." *Id.* (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 229 (Tex. 1991)). Where the other prerequisites to personal

28

jurisdiction are met, a defendant arguing that the exercise of jurisdiction would offend traditional notions of fair play and substantial justice must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Guardian Royal Exch.*, 815 S.W.2d at 231 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct. 2174, 2185, 85 L. Ed. 2d 528 (1985)). Because "such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional," this is a difficult burden to meet. *Id.* (quoting *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185). The burden is even heavier concerning GRR's contract claims, because specific jurisdiction over those claims is based on a contract containing a forum-selection clause. In such cases, it is "incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *In re AIU Ins. Co.*, 148 S.W.3d 109, 113 (Tex. 2004) (orig. proceeding) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S. Ct. 1907, 1917, 32 L. Ed. 2d 513 (1972)).

Although Central lists four reasons for concluding that a Texas court's exercise of personal jurisdiction over the company would offend traditional notions of fair play and substantial justice, Central does not contend that trying GRR's contract claims in Texas effectively would deprive Central of its day in court, and its concerns regarding GRR's quantum meruit and fraudulent-misrepresentation claims can be accommodated short of finding jurisdiction unconstitutional. Briefly, then, Central's remaining challenges to the order denying its special appearance are as follows.

## A.    The Forum-Selection Clause of the First Contract

Central first contends that trying GRR's claims in Texas would violate traditional notions of fair play and substantial justice because the parties' original

2011 contract included an Australian choice-of-law provision and required claims to be arbitrated in Australia. GRR, however, is not suing under the First Agreement, which expired before these events. In addition, and for the reasons previously discussed, the evidence is legally and factually sufficient to support the trial court's implied finding that Central and GRR negotiated and executed the Second Agreement in Texas, which contains Texas forum-selection and choice-of-law provisions. As previously noted, those implied findings are not binding on the factfinder in deciding the case on the merits, but whether the case is tried in Australia or Texas, the factfinder will have to make findings that will determine whether its own law or a foreign law applies to the dispute. On this issue, a Texas forum is no more inconvenient than an Australian forum.

## B.    Location of Witnesses

Central asserts that most witnesses in the case reside in Australia, and that some witnesses can be compelled to attend only in Australia. In particular, Central states that Shortt "is refusing to cooperate in this litigation and can only be subpoenaed in Australia." In support of this statement, Central cites Daniel White's affidavit testimony that "Shortt has stated that he does not wish to be further involved with this lawsuit. It is my belief that Shortt will not voluntarily testify in this lawsuit and will therefore need to be subpoenaed." White adds that Shortt could be subpoenaed if the dispute were litigated in Australia, but "[t]he same *may* not be true if Central is required to litigate this dispute in Texas."[12]    Then again, it may.[13]

---

[12] Emphasis added.

[13] We note, for example, that it has been more than thirty years since the United States accepted Australia's accession to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters 1970 ("the Evidence Convention"), *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231. *See San Lorenzo Title & Improvement Co. v. Caples*, 48 S.W.2d 329, 331 (Tex. Civ. App.—El Paso 1932) (stating that courts must take judicial notice of treaties), *aff'd*, 124 Tex. 33, 73 S.W.2d 516 (1934). The Evidence Convention allows parties

30

Moreover, the evidence from Shortt himself demonstrates his voluntary cooperation: three statements in the special appearance under review were verified by Shortt "for and on behalf of Central Petroleum Limited." Although litigating a case in a distant country may well be a burden on the witnesses, such a burden must be borne by some witnesses regardless of where the case is litigated. Representatives of Central, however, have traveled to Texas in the past, but there is no evidence that a representative of GRR has traveled to Australia. It also must be remembered that the parties have an interest in having their contract claims adjudicated in the forum to which they agreed, and as for GRR's tort claims, "[a] state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479, 79 L. Ed. 2d 790 (1984) (quoting *Leeper v. Leeper*, 114 N.H. 294, 298, 319 A.2d 626, 629 (1974)). We therefore disagree that the location of Central's witnesses in Australia is a compelling reason to conclude that litigation in Texas is unreasonable.

## C. Collection of the Judgment

Central initially asserted that any judgment against it must be registered in Australia for enforcement and will have to be collected in Australia. In our original opinion, we wrote,

> Assuming, without deciding, that this is correct, Central does not explain why it is unfair or unjust to a foreign company that a judgment against it must be registered and collected in the same place where the

to a civil case in one participating country to obtain evidence in another participating country through "letters of request," which are similar to letters rogatory. *See* the Evidence Convention, art. 1 ("In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act."); *see also id.* art. 10 ("In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.").

company is located.  We see no reason to consider such requirements unfair or unjust when neither Central nor GRR claim to be burdened by them.

In its reply brief, however, Central reversed its position, and instead argued that "Australia's Foreign Judgments Act of 1991 allows judgments from certain countries to be registered and enforced," but that the United States is not a participating country, so that a judgment from this country cannot simply be registered, and an Australian court instead would have to determine under its common law whether a Texas judgment is enforceable.  Still later, Central filed a post-submission brief stating that an Australian trial court had rendered an opinion "regarding the same dispute between the same parties."  Although Central attached a copy of the opinion, it did not specifically ask that we take judicial notice of it.  After we issued our original opinion, however, GRR filed a motion asking us to deny Central the right to file a motion for rehearing, and GRR, too, attached a copy of the Australian court's opinion.  Like Central, GRR did not ask us to take judicial notice of the opinion.  Finally, Central filed a motion for rehearing in which it asserted that "no judgment will be enforceable without litigating this case in Australia," and again relied on the Australian court's opinion.

To resolve these arguments about whether a Texas judgment is enforceable in Australia and about the effect of the Australian court's opinion, we will briefly discuss Australian law, and construing the parties' references to the Australian trial

court's opinion as a request for judicial notice,[14] before discussing what was and was not decided by that ruling.[15]

### 1.    *Australia's Enforcement of a Texas Judgment*

Australia's Foreign Judgments Act of 1991 ("the FJA") allows judgments from participating countries to be registered for enforcement in Australia, while the enforceability of judgments from non-participating countries such as the United States are decided under Australia's common law.  It appears, however, that under *both* the FJA and the common law, an Australian court determines enforcement not by relitigating the case as Central contends, but by determining whether the foreign court had jurisdiction.  Moreover, under both the FJA and Australian common law, a contractual forum-selection clause confers jurisdiction on the foreign court:

> For both registration under the FJA and enforcement at common law, the foreign Court must have had, *inter alia,* jurisdiction in the 'international' sense—that is, jurisdiction established by residence in the foreign country, submission to the jurisdiction of the foreign Court, or an agreement to so submit (as, for example, in a choice of forum clause in a contract).

---

[14] We may take judicial notice of an adjudicative fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  TEX. R. EVID. 201.  We conclude that the Australian court's opinion satisfies this requirement because the copies submitted by the parties are identical to each other and to the same opinion published on the website of the Supreme Court Library Queensland, *available at* https://www.sclqld.org.au/caselaw/QSC/2017/223 (last visited February 27, 2018).

[15] GRR argues that Central has waived any arguments that it failed to raise in the trial court. Central did not argue in its special appearance that a Texas judgment would be unenforceable in Australia, and in its reply in the special-appearance proceedings, it argued only that a Texas judgment in GRR's favor "would have to be registered in Australia for enforcement."  But as the Texas Supreme Court has explained, "We do not consider *issues* that were not raised in the courts below, but parties are free to construct new *arguments* in support of issues properly before the Court."  *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014) (citing *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013) (per curiam)).  We consider Central's points about the enforceability in Australia of a Texas judgment to be a new argument in support of the issues raised in the trial court and reurged on appeal.

Paul Hughes and Mark Wilks, *Australia, in* TRANSNATIONAL LITIGATION: A PRACTITIONER'S GUIDE § 2:9 (John Fellas ed., Thompson Reuters 1997 & Supp. Dec. 2017). That is the very basis on which this court affirmed the trial court's denial of Central's special appearance.

The Australian common-law in this respect is similar to the treatment in Texas of another nation's judgment under the Uniform Foreign-Country Money Judgments Recognition Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 36A.001–.011 (West Supp. 2017). A Texas court may not recognize the judgment of a foreign country if the foreign country lacked personal jurisdiction over the defendant. *See id.* § 36A.004(b)(2). But, a Texas court will not refuse enforcement for lack of personal jurisdiction if the action falls within the scope of an agreed forum-selection clause. *See id.* § 36A.005(a)(3).[16]

The same appears to be true—and, indeed, is presumed true—of an action to enforce a Texas judgment in Australia. *See James v. James*, 81 Tex. 373, 381, 16 S.W. 1087, 1090 (1891) ("Some law, from necessity, must be presumed, and none can be, in the absence of evidence, except our own."). If an Australian court determines that a foreign nation properly exercised jurisdiction, then the judgment

---

[16] Australia's treatment of a foreign judgment under the FJA is not unlike the treatment in Texas of another state's judgment under the Uniform Enforcement of Foreign Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 35.001–.008 (West 2015). This statute applies only to judgments, decrees, or court orders of a federal court or of a court entitled to full faith and credit in Texas. *See id.* § 35.001. An authenticated foreign judgment is treated as a judgment of the Texas court in which it is filed; it "has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying a judgment as a judgment of the court in which it is filed." *Id.* § 35.003(c). An authenticated foreign judgment filed in a Texas court is unenforceable if the court rendering the judgment lacked personal jurisdiction over the defendant. *See, e.g.*, *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 903 n. 34 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("Although recitals in the foreign judgment are generally presumed valid, in an action to enforce a foreign judgment, a Texas court may consider evidence that goes to the jurisdiction of the sister state court over the parties or the subject matter."); *accord*, *Ward v. Hawkins*, 418 S.W.3d 815, 825 (Tex. App.—Dallas 2013, no pet.).

generally is enforceable in Australia; if not, then the judgment will be unenforceable. That is true in this case, as it is of any other foreign judgment that is sought to be enforced in Australia.

Central speculates that "Australian courts will likely never enforce such a judgment," but that assertion is based solely on the premise that "Central has never had a fixed place of business in Texas." But, that assertion is a red herring; whether Central had a fixed place of business in Texas has never been at issue, because general jurisdiction was never alleged. This case instead is about specific jurisdiction based on a contractual forum-selection clause, not on Central's continuing business presence in Texas. GRR has never contended otherwise.

Having provided some context for Central's argument about the enforceability of a Texas judgment, we turn now to the Australian court's opinion, and to the extent to which that opinion affects the Texas proceedings, if at all.

## 2. *The Australian Court's Opinion*

Central claims that the "problem [of enforceability] became a reality when the Queensland Supreme Court [a trial court that hears civil claims exceeding $750,000][17] issued its opinion." We conclude, however, that the Australian court's opinion has no effect on this appeal because the opinion concerned a procedural point specific to the Australian litigation.

After the Texas trial court denied Central's special appearance, Central sued GRR in Queensland, Australia, seeking a declaratory judgment that it did not enter into, and is not bound by, the Second Agreement. GRR filed the equivalent of a special appearance, and asked that the trial court dismiss Central's claim, or

---

[17] *See The Queensland Law Handbook*, https://queenslandlawhandbook.org.au/the-queensland-law-handbook/the-australian-legal-system/the-court-system/.

alternatively, temporarily or permanently stay proceedings until the Texas litigation, being the first-filed action, concludes. The Australian court's rulings on those requests concerned only whether the *Australian* court—not the Texas court—could and should allow the case before it to proceed. The Australian court's opinion is its ruling on that application for dismissal or a stay of the Australian action; it is not a ruling on the merits of any claim.

GRR argued that the Australian case should be dismissed because it was served in a different country, but the Australian court explained that service outside of Australia is permissible "in a proceeding relating to a contract." Because Central's request for a declaration that the Second Agreement is a proceeding related to a contract, the Australian court ruled that it had personal jurisdiction over GRR, even though GRR was not served in Australia. In effect, the Australian trial court denied GRR's special appearance for much the same reason that the Texas trial court denied Central's special appearance.

As for GRR's request for a stay, the Australian court explained that a stay would be would be appropriate only if "Queensland [were] a clearly inappropriate forum." Because Central is an Australian company, the court held that this standard was not met.

In sum, Central has not shown that under Australian law in general, or under the Australian court's opinion in particular, a Texas judgment would be unenforceable or that the parties would be required to relitigate the case in Australia.

## D. Effect of Litigation

Central asserts that "trial or judgment could hamper development of millions of acres of oil and gas resources in Australia." Central correctly does not state that "trial or judgment *in Texas*" would have such an effect, because the alleged risk that

trial or judgment could hamper development of the property under Central's control is a risk that goes with the litigation regardless of where the case is tried.

Finally, Central maintains that "assertion of jurisdiction in Texas risks intervening in foreign affairs" because "[i]ntervention in the governance, finances, and daily schedules of those involved in developing the vast interior of Australia surely interests Australia more than Texas." Central identifies no Australian procedural or substantive policies that would be affected by litigating this dispute in Texas, and again, litigating this dispute *anywhere* will affect "the governance, finances, and daily schedules of those involved," regardless of whether the case is tried in Texas or Australia.

We conclude that Central has failed to meet its heavy burden to show that the litigating GRR's claims in a Texas forum offends traditional notions of fair play and substantial justice.

## VIII. CONCLUSION

Regarding GRR's contract claims, we hold that the evidence is legally and factually sufficient to support the trial court's implied findings that Shortt acted within the scope of his apparent authority in executing the Second Agreement. Because the Second Agreement contains a Texas forum-selection clause, the trial court did not err in concluding that Central expressly consented to specific jurisdiction over GRR's contract claims. The allegations and evidence that Central negotiated and executed a contract in Texas containing a Texas forum-selection clause and a Texas choice-of-law provision support the conclusion that Central purposefully availed itself of the benefits and protections of Texas laws. We further conclude that the Second Agreement is not rendered unenforceable for jurisdictional purposes on the grounds that the original signed contract was lost, or that it does not specify the amount of GRR's success fee, or that it allegedly was fabricated.

37

Regarding GRR's tort claims of quantum meruit and fraudulent misrepresentation, we conclude that there is a substantial connection between Texas and the operative facts of the litigation.

Finally, we hold that the trial court's exercise of personal jurisdiction over GRR's contract, quantum meruit, and fraudulent-misrepresentation claims against Central comports with traditional notions of fair play and substantial justice.

Because the trial court did not err in exercising specific jurisdiction over each of these claims, we affirm the trial court's denial of Central's special appearance.

/s/     Tracy Christopher
        Justice

Panel consists of Justices Christopher, Brown, and Wise.