Marc W. Brown, Justice
This appeal and cross-appeal arise from a partnership and an August 2008 oral agreement for appellee/cross-appellant Abdee Sharifan to sell his forty-percent limited-partnership interest in Metro Hospitality Partners, Ltd. (MHP), to appellant/cross-appellee *817 Shabahram Yazdani-Beioky (Yazdani) for $12.5 million. Additionally, Yazdani sought a declaration that either Sharifan forfeited his interest or had a reduced interest because Sharifan missed an August 31, 2009 capital call.
The trial court conducted a bench trial in two parts, by agreement of the parties. The trial court found that Yazdani did not prove forfeiture or reduced interest. The trial court found that Sharifan fully tendered his partnership share in August 2008 pursuant to the oral agreement and that Yazdani breached by not paying Sharifan any of the agreed $12.5 million. The court also found that because Sharifan failed to properly account for using excess partnership funds related to purchasing trips to China, his affirmative relief was subject to an offset of $135,000. The trial court awarded Sharifan the sum of $12,365,000, as well as just under $1.5 million in attorney's fees for trial, plus conditional appellate attorney's fees.
Yazdani brings eight issues on appeal; Sharifan brings two cross-issues and two conditional issues. In addition, Sharifan filed a motion to dismiss Yazdani's appeal. Yazdani filed objections to and moved to strike the declarations attached to Sharifan's motion. We carried these motions with the case.
We deny the motions, overrule the issues and cross-issues, and affirm.
I. BACKGROUND
A. The partnership
In September 2005, Metro Hospitality Management, LLC (MHM), Yazdani (sometimes referred to as "Bob"), and Sharifan entered into a written partnership agreement to create MHP. Under the partnership agreement, MHM was the general partner, which owned a 0.1% interest; Yazdani was a limited partner with a 59.9% interest; and Sharifan was a limited partner with a 40.0% interest. Yazdani owned 100% interest in and was the sole member of MHM. MHP owned and operated the Crowne Plaza Hotel near NRG Park facilities and the Medical Center, as well as a nearby parking lot.
The limited partners had various disagreements relating to the extensive renovations required for the former Astroworld Hotel to obtain the "Crowne Plaza" brand. They also had disagreements relating to the treatment of cash generated by parking for events such as the Houston Rodeo. "HPD was called in" for at least one of Yazdani and Sharifan's arguments. During the summer of 2008, the partnership relationship of Yazdani and Sharifan was "creating a terrible mess for" and "affecting operations at the hotel."
B. The buyout negotiations
Hotel general manager Sayed Hassan approached Yazdani to see whether he would be willing to buy out Sharifan's share of the partnership. Yazdani indicated "that was probably the right thing to do" and asked Hassan to approach Sharifan to see if he was willing to sell and to find out at what price. Sharifan told Hassan he would sell his share for $15 million. Yazdani countered, though Hassan, with $12 million. Hassan stated that Sharifan initially was not interested, but Hassan proposed and Sharifan said "yes" to $12.5 million. Hassan went back to Yazdani, who "agreed on" the "final number" of $12.5 million "cash" for "all of Mr. Sharifan's interest." "There were no other terms," only "the number." Sharifan went to meet with Yazdani in his office and "shook hands" with him on the deal. Yazdani told Sharifan he was "getting a good return" that was "fair." Yazdani told Sharifan, "Okay. 12-and-a-half, *818 go see [attorney] Mike Little."[1]
Sharifan went to see Little. Little knew that Yazdani was going to buy out Sharifan's partnership interest for $12.5 million cash. When Sharifan mentioned the unsettled parking lot cash, Little told Sharifan that he should "take [his] money and go." Little told Sharifan to come back in a couple more days to sign the paperwork to transfer his interest. On August 13, 2008, however, Little sent Sharifan an email that stated: "Bob called me this morning and said that he would pay $7,500,000."
Sharifan obtained an attorney, Joe Slovacek. Slovacek entered into discussions with Yazdani's attorneys at then-Fulbright & Jaworski regarding Yazdani's "payment promise of $12,500,000" for Sharifan's partnership interest. Slovacek stated that the August 2008 oral agreement involved "cash for transfer of the partnership interest" without any contingencies-"These folks wanted a divorce. [$12.5 million] seemed to be a fair number, according to my client." Yazdani's Fulbright attorneys disputed that Yazdani had made any promise and recommended the parties engage in negotiations to resolve the dispute. In December 2008, Yazdani's attorneys made a written offer of $5.75 million, which Sharifan, though Slovacek, rejected. In 2009, Yazdani approached his and Sharifan's mutual acquaintance Hossein Farshchi and asked if Farshchi would broker a deal with Sharifan. The various offers and counteroffers were approximately $8 million, $6.8 million, and $6.5 million. According to Farshchi, Yazdani said Sharifan should have taken Yazdani's earlier offer of $12 million.
At trial, Yazdani denied ever having made any offer to Sharifan to purchase his partnership interest at any price. Not only did Yazdani deny the interactions relating to the August 2008 deal, but also he testified he had no memory at all of negotiating with Sharifan later about buying out his interest, either through Little or Yazdani's Fulbright attorneys or though Farshchi.
C. The capital calls
Pursuant to section 4.3(A) of the partnership agreement, "Additional Contributions," the general partner had the right to make a capital call of the partners for additional capital contributions. Yazdani first requested a capital contribution in August 2008 but revoked it in October 2008. Additional requests for capital were issued in June and August 2009, and Sharifan contributed his share of these capital calls. Sharifan did not contribute to an additional formal capital call issued on August 31, 2009. Yazdani contributed Sharifan's proportionate share of this capital call. Yazdani elected to treat the additional contribution as additional capital of the partnership under section 4.4(A) of the partnership agreement, "Failure to Make Capital Contributions."
D. The bench trial
On November 3, 2009, MHM and Yazdani filed suit against Sharifan. MHP was later added as a plaintiff. Yazdani[2] sought a declaratory judgment that Sharifan has no interest in the partnership or in the alternative that the trial court determine Sharifan's current interest under the partnership agreement.[3] Sharifan answered and counterclaimed that Yazdani breached their August 2008 oral agreement. Also, on *819 December 16, 2009, Sharifan filed suit against Yazdani in another cause number; the two cases were later consolidated.[4] Yazdani pleaded that Sharifan's claims were barred at least in part by offsets due to Sharifan's misuse of partnership funds.
The trial court conducted a bench trial in two phases: first, Yazdani's claims and then Sharifan's claims. The trial court issued an amended final judgment in May 2015.[5] The trial court ordered that Sharifan recover the sum of $12,365,000.00 from Yazdani. The trial court awarded Sharifan his reasonable and necessary attorney's fees of $1,484,950.00 for trial, as well as conditional attorney's fees for appeal. The court also awarded prejudgment interest at the rate of five percent per annum from December 16, 2009, until the date of judgment and postjudgment interest at the rate of five percent per annum. "In connection therewith, the Court hereby declare[d] that all of Sharifan's former ownership interest in Metro Hospitality Partners, Ltd. belong[ed] to Shabahram Yazdani-Beioky." Yazdani and Sharifan requested and submitted proposed findings of fact and conclusions of law.
Yazdani filed motions for JNOV and new trial, which the trial court denied. After being directed by this court, the trial court issued findings of fact and conclusions of law on May 16, 2016. The topics covered by the 63 findings of fact included: the partnership; the August 2008 buy-sell agreement; request for declaration of forfeiture of partnership interest; Sharifan's fraud claims; the "China Trip" accounting; the 2009 settlement agreement; Sharifan's attorney's fees; and Yazdani's attorney's fees. The trial court also issued 12 conclusions of law. Both sides requested additional findings and conclusions, which the trial court did not provide.
Yazdani brings eight issues on appeal; Sharifan brings two cross-issues and two conditional issues. Where appropriate, we consider related issues together.
II. POST-SUBMISSION MOTIONS
After oral argument and submission, Sharifan filed a motion to dismiss, arguing that Yazdani's acceptance of the benefits of the trial court's judgment by taking dominion over all the partnership interests rendered his appeal moot. Further, Sharifan contends he cannot be put back in his pre-final judgment status given Yazdani's poor record-keeping and manipulation of the books since the final judgment was entered. Sharifan attached exhibits to his motion, including: a transcript of oral argument; declarations by Sharifan, CPA Bryne Liner who testified at trial, and Sharifan's trial and appellate counsel Lloyd Kelley; email correspondence dated May 20-21, 2015, between trial counsel concerning Sharifan's request for MHP's "May financials"; and the trial court's order signed February 1, 2013, appointing a master in chancery.
Yazdani responds that any acceptance of benefits was limited to his standing on the partnership's recalculation of capital accounts. Yazdani contends that the partnership and general partner appropriately continued operating the hotel per the partnership agreement, not as a benefit of the judgment. Yazdani argues that his right to possession preceded the judgment, and his actions since then have not prejudiced *820 Sharifan. Yazdani also filed objections and a motion to strike the declarations submitted by Sharifan.
" '[A]djudication on the merits is preferred in Texas.' " Kramer v. Kastleman , 508 S.W.3d 211, 227 (Tex. 2017). The acceptance-of-benefits doctrine only "bars an appeal if the appellant voluntarily accepts the judgment's benefits and the opposing party is thereby disadvantaged." Id. at 217. This doctrine is based on the principle of estoppel and is rooted in equity. Id. "Conceptually, the doctrine infers an agreement to terminate the litigation because the judgment has been voluntarily paid and accepted, or implies a waiver, release of errors, or admission that the decree is valid." Id. at 218. "Whether estoppel of the right to appeal is warranted involves a fact-dependent inquiry entrusted to the courts' discretion." Id. at 228.[6] "[A] merits-based disposition must not be denied absent disadvantage to the opposing party and circumstances reflecting clear intent to acquiesce in the judgment's validity." Id. at 232. The burden of proof rests on the party asserting the doctrine, and "[t]he failure to prove all essential elements is fatal." Id. at 217.
We conclude that Sharifan has not proven the acquiescence prong. This case concerned whether the parties entered into, and Yazdani breached, a valid oral agreement for limited-partner Yazdani to purchase Sharifan's limited-partnership interest in August 2008 and what effect, if any, a post-agreement August 31, 2009 capital call unpaid by Sharifan had on such partnership interests. During trial, Yazdani took the position that no agreement existed and, further, where Sharifan forfeited his interest or Sharifan's percentage interest was reduced to zero when he did not contribute to the capital call per the partnership agreement, that Yazdani had the right to full possession. Yazdani essentially takes this same position on appeal.
Both before and after the judgment, there is no dispute that Yazdani was a limited partner in MHP and had rights in at least his original almost-sixty-percent partnership interest. See ids="12370844" index="7" url="https://cite.case.law/sw3d/508/211/#p227">id. at 229. Also both before and after the judgment, Yazdani as the sole owner of the general partner MHM had the right to manage the partnership's business. See ids="12370844" index="8" url="https://cite.case.law/sw3d/508/211/#p227">id. Post judgment, the partnership's business continues to be owning and operating the Crowne Plaza Hotel. See ids="12370844" index="9" url="https://cite.case.law/sw3d/508/211/#p227">id. at 228-29. Post judgment, Yazdani requested findings of fact and conclusions of law, filed motions for new trial and for judgment as a matter of law, obtained a supersedeas bond, and requested additional findings of fact and conclusions *821 of law. See DDR DB Stone Oak, LP v. Rector Party Co., LLC , No. 04-17-00018-CV, 2017 WL 6032541, at *3 (Tex. App.-San Antonio Dec. 6, 2017, no pet.) (mem. op.) ("Based on this record, we cannot infer an agreement to terminate the litigation."). With regard to Yazdani's full-interest ownership, even if Yazdani were successful on appeal, he faces at least some risk of a less-favorable outcome. See Kramer , 508 S.W.3d at 229. Considering the facts and circumstances here, we cannot conclude Sharifan has proven Yazdani's clear intent to acquiesce in the judgment's validity. See ids="12370844" index="12" url="https://cite.case.law/sw3d/508/211/#p227">id. at 232.
Without proof of this clear intent, Yazdani's postjudgment conduct does not rise to the level of an estoppel, and we cannot deny Yazdani a merits-based disposition. Having so denied Sharifan's motion, we also deny Yazdani's objections and motion to strike as moot.[7]
III. STANDARD OF REVIEW
In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. Barrientos v. Nava, 94 S.W.3d 270, 288 (Tex. App.-Houston [14th Dist.] 2002, no pet.). When there is conflicting evidence, it is the province of the factfinder to resolve such conflicts. See City of Keller v. Wilson , 168 S.W.3d 802, 820 (Tex. 2005).
In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. Aguiar v. Segal , 167 S.W.3d 443, 449 (Tex. App.-Houston [14th Dist.] 2005, pet. denied). Therefore, we review a trial court's findings of fact under the same sufficiency standards we use when determining if sufficient evidence exists to support an answer to a jury question. Catalina v. Blasdel , 881 S.W.2d 295, 297 (Tex. 1994) ; Moran v. Mem'l Point Prop. Owners Ass'n, Inc. , 410 S.W.3d 397, 401 (Tex. App.-Houston [14th Dist.] 2013, no pet.). We indulge every reasonable presumption in favor of the findings and judgment of the trial court, and no presumption will be indulged against the validity of the judgment. Vickery v. Comm'n for Lawyer Discipline , 5 S.W.3d 241, 252 (Tex. App.-Houston [14th Dist.] 1999, pet. denied).
When analyzing the legal sufficiency of the evidence, we review the record in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. See City of Keller , 168 S.W.3d at 822, 827. Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 601 (Tex. 2004) (quoting Merrell Dow Pharm., Inc. v. Havner , 953 S.W.2d 706, 711 (Tex. 1997) ). We will conclude that the evidence is legally insufficient to support the finding if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. City of Keller , 168 S.W.3d at 810.
In reviewing a factual-sufficiency point, we examine the entire record, considering the evidence both in favor of, and contrary to, the challenged findings.
*822 Maritime Overseas Corp. v. Ellis , 971 S.W.2d 402, 406-07 (Tex. 1998) ; Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Ellis , 971 S.W.2d at 407 ; Cain , 709 S.W.2d at 176. When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. Dow Chem. Co. v. Francis , 46 S.W.3d 237, 241 (Tex. 2001).
When a trial court makes findings of fact, they "shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein." Tex. R. Civ. P. 299. However, we will not set aside a judgment because of conflicting findings of fact if the conflict can be reconciled. Estate Land Co. v. Wiese , No. 14-13-00524-CV, 2015 WL 1061553, at *4 (Tex. App.-Houston [14th Dist.] Mar. 10, 2015, pet. denied) (mem. op.); Hartford Ins. Co. v. Jiminez , 814 S.W.2d 551, 552 (Tex. App.-Houston [1st Dist.] 1991, no writ). The same rule applies to conflicts between findings of fact and conclusions of law. Jiminez , 814 S.W.2d at 552. Where findings of fact cannot be reconciled with conclusions of law, findings of fact will be deemed to control. Morton v. Nguyen , 369 S.W.3d 659, 676 (Tex. App.-Houston [14th Dist.] 2012), rev'd in part on other grounds , 412 S.W.3d 506 (Tex. 2013).
We apply a de novo standard of review when attempting to reconcile findings. See Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC , 407 S.W.3d 342, 366 (Tex. App.-Houston [14th Dist.] 2013, pet. denied). We must reconcile apparent conflicts in the findings if reasonably possible in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole. Bender v. S. Pac. Transp. Co. , 600 S.W.2d 257, 260 (Tex. 1980) ; Estate Land , 2015 WL 1061553, at *4 ; Zieba v. Martin , 928 S.W.2d 782, 791 (Tex. App.-Houston [14th Dist.] 1996, no writ). Where two possible interpretations exist, we choose the interpretation that will harmonize the judgment with the findings of fact and conclusions of law upon which it is based. Grossnickle v. Grossnickle , 935 S.W.2d 830, 841 (Tex. App.-Texarkana 1996, writ denied). We will not determine whether the findings reasonably may be viewed as conflicting; to the contrary, the question is whether there is any reasonable basis upon which the findings may be reconciled. Bender , 600 S.W.2d at 260.
We review a trial court's conclusions of law de novo to determine if the trial court drew the correct legal conclusions from the facts. BMC Software Belg., N.V. v. Marchand , 83 S.W.3d 789, 794 (Tex. 2002). An incorrect conclusion of law does not warrant a reversal if the judgment is otherwise correct on the merits. Id. ; Able v. Able , 725 S.W.2d 778, 780 (Tex. App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (citing Vandever v. Goettee , 678 S.W.2d 630, 635 (Tex. App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) ). Nor does an erroneous finding of fact. Vickery , 5 S.W.3d at 261 ; Able , 725 S.W.2d at 780. We may only reverse the trial court's judgment if the court made an erroneous finding on an ultimate fact issue; immaterial findings are harmless and are not grounds for reversal. Castro v. Castro , No. 14-11-01087-CV, 2013 WL 1928742, at *5 (Tex. App.-Houston [14th Dist.] May 9, 2013, no pet.) (mem. op.).
*823 IV. ISSUES PRESENTED
A. The August 2008 oral agreement
We first consider Yazdani's third issue-"[w]hether Sharifan proved the existence of an enforceable oral contract for the purchase and sale of his partnership interest." We conclude that Sharifan did.
To prove contract formation a party must prove, among other elements, an offer and acceptance and a meeting of the minds on all essential elements. WTG Gas Processing, L.P. v. ConocoPhillips Co. , 309 S.W.3d 635, 643 (Tex. App.-Houston [14th Dist.] 2010, pet. denied) ; see Wal-Mart Stores, Inc. v. Lopez , 93 S.W.3d 548, 555-56 (Tex. App.-Houston [14th Dist.] 2002, no pet.). "A 'meeting of the minds' is 'merely a mutuality subpart of the offer and acceptance elements.' " WTG Gas , 309 S.W.3d at 643 (quoting Domingo v. Mitchell , 257 S.W.3d 34, 40 (Tex. App.-Amarillo 2008, pet. denied) ). "Questions of contract formation must be resolved on objective standards, based upon the meaning reasonably conveyed by the parties' actions and words rather than their uncommunicated subjective intentions." Parker Drilling Co. v. Romfor Supply Co. , 316 S.W.3d 68, 73 (Tex. App.-Houston [14th Dist.] 2010, pet. denied) ; see Wal-Mart Stores , 93 S.W.3d 548 at 556. We view the conduct and circumstances surrounding the transaction from a reasonable person's interpretation at the time. Parker Drilling , 316 S.W.3d at 73.
Whether the parties reached an agreement is a question of fact. Advantage Physical Therapy, Inc. v. Cruse , 165 S.W.3d 21, 24 (Tex. App.-Houston [14th Dist.] 2005, no pet.). Whether an agreement is legally enforceable is a question of law. Id. ; Gaede v. SK Invs., Inc. , 38 S.W.3d 753, 757 (Tex. App.-Houston [14th Dist.] 2001, pet. denied).
"To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.' " Fischer v. CTMI, L.L.C. , 479 S.W.3d 231, 237 (Tex. 2016) (quoting Pace Corp. v. Jackson , 155 Tex. 179, 284 S.W.2d 340, 345 (1955) ). "[A] contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." Id. (citing Fort Worth Indep. Sch. Dist. v. City of Fort Worth , 22 S.W.3d 831, 846 (Tex. 2000) ). Even when intent is clear, the agreement's terms must also be sufficiently definite to enable a court to understand the parties' obligations and give an appropriate remedy for a breach. Id.
"However, a contract need only be definite and certain as to those terms that are 'material and essential' to the parties' agreement." Id. (citing T.O. Stanley Boot Co. v. Bank of El Paso , 847 S.W.2d 218, 221 (Tex. 1992), and Radford v. McNeny , 129 Tex. 568, 104 S.W.2d 472, 475 (1937) ). "[M]aterial and essential terms are those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." Id. (alteration in orig.). The material terms of a contract are determined on a case-by-case basis, with each contract considered separately. Id. (citing McCalla v. Baker's Campground, Inc. , 416 S.W.3d 416, 418 (Tex. 2013), and T.O. Stanley , 847 S.W.2d at 221 ).
The trial court issued several findings of fact in connection with the August 2008 buy-sell agreement, including:
6. On or about August 13, 2008, Yazdani individually agreed to purchase all of Sharifan's 40% limited partnership interest in *824 the Partnership for $12.5 million (the "Agreement").
7. There were at least three witnesses to the transaction whereby Yazdani individually agreed to purchase all of Sharifan's 40% limited partnership interest in the Partnership for $12.5 million in August 2008.
8. The former general manager of the Hotel, Sayed Hassan, testified that Yazdani made a verbal (oral) offer to buy out 100% of Sharifan's 40% limited partnership interest of the Partnership in August 2008. Hassan testified that after some negotiations, Sharifan accepted Yazdani's offer to buy his interest for $12.5 million. Hassan testified Sharifan went to confirm the deal with Yazdani in person. Hassan testified that Yazdani confirmed to him that he and Sharifan had agreed upon $12.5 million as the purchase price and the terms were cash payment. Hassan testified that according to Yazdani there were no other terms or conditions to the purchase. Later, Yazdani confirmed again to Hassan that a deal had been made to purchase all of Sharifan's limited Partnership interest at $12.5 million cash.
9. The Court finds that all of Hassan's testimony was direct, credible and truthful.
10. Sharifan was another one of the witnesses to the Agreement. Sharifan testified that after the Partnership received an offer from a third-party group to purchase all of the Partnership's assets, Yazdani made an offer to buy out his partnership interest for $12.5 million cash sometime around August 13, 2008. Sharifan testified that after some negotiation, he accepted Yazdani's offer. Sharifan testified the deal was negotiated through Hassan and the Hotel's architect in the restaurant located in the Hotel. Sharifan testified that Hassan acted as an intermediary between him and Yazdani as to his sale of interest to Yazdani. Sharifan testified after an agreement was reached at $12.5 million for all of Sharifan's limited Partnership interest, Sharifan went down to the basement to Yazdani's office and spoke directly to Yazdani about the Agreement. Sharifan confirmed the purchase price of $12.5 million and shook hands with Yazdani solidifying the deal. Yazdani commented that at that price Sharifan was getting a "good deal." Yazdani told Sharifan to go see his lawyer, Mike Little, in a couple days to finalize the transfer of Sharifan's interest to Yazdani. Sharifan testified he then went to Little's office to execute the transfer of his interest documents. Sharifan testified that when he went to Little's office, Little told him he knew of the deal and that he was working on the transfer papers but they were not done yet but also that there wouldn't be any problem since Little had already spoken to "Bob" about the deal.
11. Sharifan testified that Little subsequently sent an e-mail that indicated Yazdani was not going to pay the $12.5 million but that "Bob" would instead pay $7.5 million for Sharifan's limited Partnership interest.
12. The Court finds that Sharifan's testimony as to Yazdani's offer to purchase Sharifan's 40% limited Partnership interest for $12.5 million cash and Sharifan's tender delivery of his interest to Yazdani was direct, credible and truthful.
13. The other witness to the transaction was Yazdani. Yazdani repeatedly denied ever having made any offer or attempt to purchase Sharifan's limited Partnership interest at any price.
14. Yazdani even denied the $7.5 million offer contained in Little's email to Sharifan in August 2008. Yazdani denied any interaction with his general manager Hassan regarding any attempt to purchase Sharifan's interest in 2008. It wasn't that Yazdani had a different version of the offers or exchange of offers *825 or terms of any sale, Yazdani categorically denied any such offer or exchange ever happened. Yazdani testified in both phases of the trial that neither he nor any one on his behalf ever made any offers to purchase Sharifan's limited Partnership interest. Yazdani's denial also included the offer made by his attorney's [sic] at Fulbright & Jaworski in 2008 to purchase Sharifan's limited Partnership interest which said offer was in writing. Yazdani denied having any such discussion with a broker, Farschid [sic], in early 2009 at the Edwards movie theater about purchasing Sharifan's interest. Yazdani denied all of the conversations ever took place that involved him purchasing Sharifan's interest. Yazdani emphatically denied ever having made any offer to buy any portion of Sharifan's interest, period. Yazdani testified any such discussion about any such offer for him to purchase Sharifan's interest never ever happened, period.
15. In addition to the two eye witnesses [sic] who testified that Yazdani offered in August 2008 to purchase Sharifan's limited Partnership interest for $12.5 million, there was other circumstantial evidence that the Court considered.
16. Various e-mails indicated that at least some discussion had taken place in August 2008 whereby Yazdani sought to purchase Sharifan's interest. Yazdani could not explain Little's e-mail in which Little states he had just spoken to "Bob" and that he was only willing to pay $7.5 million. Yazdani could not explain the written offer made by his attorney's [sic] at Fulbright & Jaworski in 2008 offering to purchase Sharifan's interest. In addition, Little's communication to Sharifan regarding the enforceability of any such agreement after Yazdani had repudiated the Agreement was an obvious "CYA letter" evidencing that some deal had been made and that Yazdani had subsequently decided he was not going to comply with it.
17. The Court finds that Yazdani was generally not a credible witness and that he often did not testify truthfully.
...
22. In short, throughout both phases of the trial, the Court found that Yazdani's testimony was not credible or truthful on many key issues in the case.
23. The Partnership does not have physical Partnership ownership interests to exchange such as "stock certificates". Yazdani always maintained sole control over the books and records of the Partnership. Because there are no stock certificates or other requirements to effectuate transfer of ownership interest under the Partnership Agreement, the sale was complete when Sharifan tendered his interest to Yazdani. Sharifan tendered full performance in August 2008. Sharifan appeared as requested by Yazdani, at the office of Yazdani's attorney, Mike Little, Esq., to execute documents reflecting the exchange of Sharifan's 40% limited partnership interest to Yazdani for $12.5 million.
24. It is undisputed that Yazdani never paid anything for Sharifan's limited partnership interest in Metro Hospitality Partners, Ltd. (the "Partnership"). Sharifan made demand for payment in August 2008 and Yazdani refused to pay.
1. Intent to be bound
Yazdani first contends that the August 2008 oral agreement was unenforceable as a matter of law where the parties' negotiations indicated a written draft was contemplated as a final conclusion to the negotiations. Yazdani points to Sharifan's acknowledgement of and agreement with Yazdani's instruction to go see *826 Little as conclusive evidence that Sharifan knew Yazdani did not intend to be bound absent a written agreement. Yazdani also points to the fact that the partnership agreement was in writing and to the later exchange of "complex" draft transaction documents prepared by Sharifan's attorneys.
Considering the parties' conduct and words objectively, based on a reasonable person's interpretation, Sharifan and Yazdani had a meeting of the minds that Yazdani would buy out Sharifan's entire partnership interest for $12.5 million cash. As a general rule, intent to be bound is a question of fact. Foreca, S.A. v. GRD Dev. Co., Inc. , 758 S.W.2d 744, 746 (Tex. 1988). The parties did not express, and their interactions do not otherwise conclusively convey, that Yazdani regarded their agreement as conditional or not binding until reduced to writing. According to Yazdani, he never expressed anything with regard to the August 2008 oral agreement because those negotiations did not take place. As the trial court found, there were "no stock certificates or other requirements to effectuate transfer of ownership interest under the Partnership Agreement." The trial court found that Sharifan "went to Little's office to execute the transfer of his interest documents." Yazdani's request for Sharifan to "go see Mike" and sign paperwork reasonably could be interpreted as merely the means to memorialize the already-agreed-upon transfer. See ids="9981949" index="71" url="https://cite.case.law/sw2d/758/744/#p746">id. (upholding jury's finding on intent where "subject to legal documentation" language contained in letter regarding sale of amusement park rides was not conclusive on lack of intent to be bound). Nor does the fact that the 2005 partnership agreement was in writing and contained a merger clause as to prior or contemporaneous agreements or that efforts after the August 2008 oral agreement to resolve the parties' dispute took the form of written drafts prove as a matter of law that the parties did not intend to be bound at the time of their handshake deal.
Yazdani's reliance on WTG Gas , where this court determined as a matter of law that there was no intent to be bound without execution of a written document, does not persuade us otherwise. Unlike here, in WTG Gas , during the written bid procedures for the sale of a natural-gas processing facility, there was "definitive" and "unequivocal" expression of the selling party's lack of intent to accept an offer or to bear any contractual obligation to the buying party absent execution of a written agreement. 309 S.W.3d at 638, 645 (distinguishing Foreca where "ConocoPhillips bid procedures were much more definitive than the 'subject to legal documentation' language in Foreca "-"Until the [PSA(s) ] for this transaction is executed by ConocoPhillips and a purchaser, [ConocoPhillips], its affiliates and related parties shall not have any obligations to any party with respect to the contemplated transaction....").
We also are unpersuaded by Principal Life Insurance Co. v. Revalen Development, LLC , 358 S.W.3d 451 (Tex. App.-Dallas 2012, pet. denied). Principal Life concerned the alleged breach of an oral contract for the sale of a note secured by commercial real estate; there, the phone call at issue did not communicate an offer that could be accepted, but rather discussed the status of a redline shell document within an internal preliminary written contract approval process, where it was not yet clear which entity of one of the parties would even be entering the contract. Id. at 453, 455-56. Yazdani has failed to conclusively demonstrate lack of intent to be bound absent a written agreement.
2. Material and essential terms
Next, Yazdani argues that the parties did not agree on all material terms, *827 and many material terms were speculative and unresolved.
Yazdani first takes issue with the August 2008 oral agreement because the parties did not reach "agreement on the timing or manner of Yazdani's payment and Sharifan's transfer of his partnership interest." Yazdani argues that, because assets fluctuate in value over time, the time of performance associated with a particular price for a particular partnership interest is material. Yazdani cites Miga v. Jensen , 96 S.W.3d 207 (Tex. 2002). Miga , however, did not discuss materiality of time or manner of performance in terms of the contract's enforceability. Instead, Miga considered whether a plaintiff who entered into an oral contract regarding, and was denied, the exercise of stock options could recover "lost profits" as of the time of trial or time-of-breach damages. Id. at 213-17. The Miga Court concluded that the proper way to make the plaintiff whole was to award him interest on his time-of-breach damages. Id. at 217.
The absence of an express time for performance does not necessarily mean that the parties did not enter into an enforceable agreement; generally, the law will imply a reasonable time. See Moore v. Dilworth , 142 Tex. 538, 179 S.W.2d 940, 942 (1944) ; Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd. , 264 S.W.3d 892, 899-900 (Tex. App.-Fort Worth 2008, no pet.) ; Atl. Lloyds Ins. Co. v. Butler , 137 S.W.3d 199, 212 (Tex. App.-Houston [1st Dist.] 2004, pet. denied). Moreover, the facts and circumstances indicate the parties agreed and intended that the transfer reasonably would occur within the next few days with the entire purchase price to be paid in cash. There were no other performance terms such as financing.
Yazdani's cited cases do not support that further timing or manner details were essential to this contract. See Campbell v. Nw. Nat. Life Ins. Co. , 573 S.W.2d 496, 498 (Tex. 1978) (oral agreement at issue granting option to purchase apartment complex was subject to statute of frauds; case involved right to recover in quantum meruit independent of contract); Botello v. Misener-Collins Co. , 469 S.W.2d 793, 795 (Tex. 1971) (purchase of land agreement was subject to statute of frauds; also, parties agreed $5,000 of $200,000 purchase price was to be paid in cash without agreeing as to time or manner of payment of remaining $195,000).[8]
Yazdani next challenges the parties' lack of agreement on whether, when, or how Sharifan was to be released from his personal guarantee on a partnership bank loan. Yazdani points to Sharifan's testimony:
Q. Okay. Now, am I accurate that any deal, whether it was for 12 and a half million or 8 million or 6.8 million, included the term that Mr. Yazdani would assume your debt obligation at Woodforest National Bank and get you off of the note?
A. That was always-that was admit (phonetic) to me that I would be removed out of the note in the bank.
Q. And that was always a term in any deal that you had?
A. What are you saying?
Q. Well, that was-that had to be part of any deal that you had, correct?
A. The obligation of the note to go solely to Mr. Yazdani was part of the *828 negotiation. Is that what you are asking me?
Q. That's what I am asking you.
A. Yes, yes. I thought you were asking if it was contingence [sic] to that. No, but it was always subject-he would assume the entire obligation to the bank.
This testimony indicates that the parties apparently had discussed Yazdani's assuming the bank obligation as a "subject," but their deal was not "contingence [sic]" on it. It does not conclusively establish that the removal of Sharifan's guarantee was material to the August 2008 oral agreement. Sharifan also testified that "[i]t really didn't matter" for the deal whether he remained as a personal guarantor on the bank loan, and "[i]t was never a condition" that his name had to be removed from the loan. Hassan indicated that during negotiations there was no discussion "whatsoever" about Sharifan being released from the bank loan. And, again, Yazdani's position at trial was not that the parties failed to agree on any term, but that there were no negotiations at all.
Next, Yazdani asserts that even if Sharifan agreed to "let [his share of the parking lot cash] go," the parties did not reach any agreement on the "settling" of what Sharifan owed the partnership. Yazdani points to testimony by Sharifan regarding discussions they had about "eventually" settling the money Sharifan was owed for various equipment he supplied to the hotel against various expenses, such as for electricity, freight, and his employees' payroll, which the hotel had covered for Sharifan while he was in China. The agreement was for Sharifan to transfer his full partnership interest to Yazdani for $12.5 million cash. That "settling" could have been made a part of the negotiations does not establish the August 2008 oral agreement was missing material and essential terms. The "settling" issue did not come up during the parties' negotiations. (Again, Yazdani's position was that negotiations did not happen.) Additionally, under circumstances where there is a finding that Sharifan tendered his full performance in August 2008, "[t]he law favors finding agreements sufficiently definite for enforcement." See Fischer , 479 S.W.3d at 240 ; Cent. Petroleum Ltd. v. Geosci. Res. Recovery, LLC , 543 S.W.3d 901, 917-18, No. 14-16-00933-CV, 2018 WL 1189403, at *10 (Tex. App.-Houston [14th Dist.] Mar. 8, 2018, no pet. h.) (subs. op.).[9]
We overrule Yazdani's third issue.
B. The trial court's breach-of-contract award to Sharifan
a. Applicable law
The ultimate goal in measuring damages for a breach of contract is to provide just compensation for any loss or damage actually sustained as a result of the breach. Clear Lake City Water Auth. v. Friendswood Dev. Co., Ltd. , 344 S.W.3d 514, 523 (Tex. App.-Houston [14th Dist.] 2011, pet. denied) ; Mays v. Pierce , 203 S.W.3d 564, 577 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). "The normal measure of damages in a breach-of-contract case is the benefit-of-the-bargain measure, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed." Mays , 203 S.W.3d at 577 *829 ; see Sacks v. Hall , 481 S.W.3d 238, 246 (Tex. App.-Houston [1st Dist.] 2015, pet. denied) ; Clear Lake City Water , 344 S.W.3d at 523. "The correct standard for assessing loss of benefit of the bargain damages measures the difference between the value as represented and the value as received by the nonbreaching party." Sacks , 481 S.W.3d at 247 ; see DaimlerChrysler Motors Co., LLC v. Manuel , 362 S.W.3d 160, 180 (Tex. App.-Fort Worth 2012, no pet.) ("One measure of direct damages is the 'benefit of the bargain' measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.").
Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. Blue Moon Venture, L.L.C. v. Horvitz , No. 14-09-00459-CV, 2010 WL 4013533, at *1 (Tex. App.-Houston [14th Dist.] Oct. 14, 2010, no pet.) (mem. op.) (citing Stafford v. S. Vanity Magazine, Inc. , 231 S.W.3d 530, 535 (Tex. App.-Dallas 2007, pet. denied) ). "A party seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times." Id. (citing DiGiuseppe v. Lawler , 269 S.W.3d 588, 593-94, 601 (Tex. 2008) ). Specific performance is not a separate cause of action, but rather is an equitable remedy that is used as a substitute for monetary damages when such damages would not be adequate. Tamuno Ifiesimama v. Haile , 522 S.W.3d 675, 685 (Tex. App.-Houston [1st Dist.] 2017, pet. denied) ; Stafford , 231 S.W.3d at 535. The existence of an adequate remedy at law exists forecloses the availability of equitable relief in the form of specific performance. Sharyland Water Supply Corp. v. City of Alton , 354 S.W.3d 407, 423 (Tex. 2011).
b. Specific performance
We next consider Yazdani's first issue: "[w]hether the trial court erred and/or abused its discretion in granting Sharifan specific performance of the alleged August 2008 agreement to purchase Sharifan's partnership interest." We conclude that the trial court did not award Sharifan specific performance as a remedy.
Yazdani specifically argues that the trial court's conclusion of law-
1. Sharifan is entitled to the remedy of specific performance and to recover the sum of $12,500,000.00 against Yazdani for Yazdani's breach of the August 2008 agreement to purchase Sharifan's interest in Metro Hospitality Partners, Ltd. (Metro Partnership).
-"is legally erroneous because Sharifan is not entitled to the remedy of specific performance." Yazdani further attacks the lack of a fact finding that Sharifan was ready, willing, and able to perform his obligations under the agreement to transfer his forty-percent share as of the time of trial and as of the time of final judgment. Yazdani contends that the trial court's fact findings-Sharifan became a defaulting partner by missing the August 31, 2009 capital call; the partners' capital accounts were required to be adjusted where Yazdani properly elected to treat his contribution of Sharifan's proportionate share as additional capital; and the court was unable to declare the proper values in the capital accounts or each partner's adjusted percentage interest-"establish the opposite."[10] Yazdani also argues that no *830 evidence supports the fact findings related to Sharifan's partnership interest having zero or an unascertainable market value.[11] *831 According to Sharifan, however, his principal requested remedy has always been $12,500,000 in money damages to make him whole for Yazdani's breach. Sharifan argues that "[a]ny perceived inconsistency in the trial court's findings and conclusions, or any perceived inconsistency between the findings and conclusions on the one hand and the judgment on the other, does not change the end result, which is amply supported by the law and evidence." We agree with Sharifan.
The trial court mentioned "specific performance" in two of its findings of fact:
27. Sharifan's limited partnership interest had no ascertainable market value. As such, essentially the fair market value of the interest is zero. Since the closely-held corporation's stock has no ascertainable market value or it was zero, Sharifan was entitled to seek specific performance to enforce a purchase agreement.
...
30. Market value is what a hypothetical reasonable willing buyer under no compulsion to buy would pay to a hypothetical reasonable willing seller under no compulsion to sell. With knowledge of the facts, no reasonable third-party under no compulsion to buy would have paid anything for Sharifan's position in August 2008. The only buyer for Sharifan's interest in August 2008 was Yazdani. Because the Court finds the value of Sharifan's interests are impossible to ascertain, the only appropriate remedy is to specifically enforce the terms of the breached agreement.
In addition to its first conclusion of law above, the trial court issued the following conclusions of law:
8. As it relates [to] Sharifan's claims against Plaintiffs, the Court finds that Sh[a]rifan is the "prevailing party" and after all offsets and credits should have and recover the sum of ($12,365,000.00), against Shabahram Yazdani-Beioky, together with pre-judgment interest at the rate of 5% per annum from December 16, 2009 until the date of judgment, and attorney fees. In connection therewith, Shabahram Yazdani-Beioky is hereby declared the owner of all of Sharifan's prior ownership interest in Metro Hospitality Partners, Ltd. (Metro Partnership).
9. Whatever other remedies or claims that may have been available for the Court to consider or the parties to have requested, the Court finds that Sharifan has elected to recover under his claim for breach of the August 2008 agreement to sell his stock to Yazdani. As such, all such other remedies would be moot at this point. Sharifan should recover a money judgment against Yazdani and Yazdani should be declared the owner of all the interests in the partnership.
10. Sharifan [should] have and recover the sum of $12,365,000.00 from Shabahram Yazdani-Beioky, together with pre-judgment interest at the rate of 5% per annum from December 16, 2009 until the date of judgment herein; post-judgment interest on the entire amount awarded (except for contingent appellate attorney fees) at the rate of five percent (5%) per annum, compounded annually, until paid. In connection therewith, the Court hereby *832 declares that all of Sharifan's former ownership interest in Metro Hospitality Partners, Ltd. belongs to Shabahram Yazdani-Beioky.
In his pleadings, Sharifan included requests for actual damages and for specific performance as a remedy for Yazdani's contract breach. Specific performance and monetary damages are alternative remedies for breach of contract. See Paciwest, Inc. v. Warner Alan Props., LLC , 266 S.W.3d 559, 575 (Tex. App.-Fort Worth 2008, pet. denied).
Although the trial court found that Sharifan was entitled to and that it would be appropriate to provide him with the remedy of specific performance, these "findings of fact" actually reflected the trial court's legal determination that it could exercise its discretion to award Sharifan the equitable remedy of specific performance. See Gibson v. Cuellar , 440 S.W.3d 150, 157 n.7 (Tex. App.-Houston [14th Dist.] 2013, no pet.) (designations as findings of fact or conclusions of law by trial court do not control on appeal); Stafford , 231 S.W.3d at 535 (specific performance is equitable remedy committed to trial court's discretion). However, the trial court also issued a conclusion of law that Sharifan was entitled "to recover the sum of $12,500,000.00 against Yazdani for Yazdani's breach."
The trial court could not award Sharifan both specific performance and monetary damages for Yazdani's contract breach. See Haile , 522 S.W.3d at 685 ; Stafford , 231 S.W.3d at 535. We must reconcile the apparent conflict that Sharifan was entitled to both specific performance and damages, if reasonably possible. One indication the trial court was awarding the remedy of damages and not specific performance is that the court concluded that, whatever other remedies or claims might have been available or requested, "all such other remedies" were moot where Sharifan elected to recover under his breach-of-contract claim and should recover "a money judgment." Another indication the trial court was awarding damages and not specific performance is that the court did not compel any performance by Sharifan. See Woody v. J. Black's, LP , No. 03-15-00293-CV, 2016 WL 3677241, at *3 (Tex. App.-Austin July 7, 2016, no pet.) (mem. op.) ("[A] court's order of specific performance of a contract must compel performance by both parties, rather than ordering only one party to specifically perform.").
The trial court awarded Sharifan a money judgment and declared that Sharifan's "prior" and "former" interest was Yazdani's and Yazdani owned all the interests; the court did not order that Sharifan turn over his current interest to Yazdani. There was no need to compel Sharifan to perform where he already had performed-consistent with the trial court's finding that Sharifan already had fully tendered his performance and the sale of his interest was complete in August 2008. We therefore reconcile the apparent conflict to conclude that the trial court was awarding Sharifan the remedy of contract damages, not specific performance.
Even if the trial court's findings of fact allegedly supporting (or failing to support) the remedy of specific performance or the trial court's conclusion that Sharifan was entitled to specific performance was erroneous, we conclude such findings and conclusion were not essential to and did not directly affect Sharifan's ultimate award of contract damages. They do not render the judgment reversible. See Castro , 2013 WL 1928742, at *5 ; Able , 725 S.W.2d at 780.
We overrule Yazdani's first issue.
c. Actual damages
Yazdani's second issue presented is "[w]hether the trial court's award of $12,500,000 to Sharifan could be proper as *833 an award of actual damages or as specific performance." Having already determined that the trial court did not award Sharifan specific performance, we will uphold Sharifan's money judgment as long as it was otherwise correct and supported by the trial court's findings of fact. We conclude that the negotiated contract price for the sale of a limited-partnership interest can supply the appropriate measure of damages for a breach by the buyer where there has been full performance by the seller, as supported by the findings here. Therefore, the trial court's $12.5-million award was proper.
To prevail on a breach-of-contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach. West v. Triple B Servs., LLP , 264 S.W.3d 440, 446 (Tex. App.-Houston [14th Dist.] 2008, no pet.). The trial court issued findings that: the parties entered into the August 2008 oral agreement for Yazdani to pay "$12.5 million for all of Sharifan's limited partnership interest"; Sharifan tendered delivery of his partnership interest, Sharifan fully performed, and the sale was complete when Sharifan appeared as requested by Yazdani at Little's office; Sharifan made demand for payment in August 2008; and Yazdani refused to pay and "never paid anything for Sharifan's limited partnership interest." The trial court issued conclusions of law that: Sharifan was entitled to recover the sum of $12.5 million against Yazdani for Yazdani's breach of the August 2008 oral agreement to purchase Sharifan's interest in MHP, and Sharifan has elected to recover under his claim for breach of the August 2008 oral agreement to sell his stock to Yazdani and should recover a money judgment against Yazdani.
Yazdani contends that the only correct measure of Sharifan's damages is the difference between the alleged contract price of $12.5 million and the market value of Sharifan's partnership interest in August 2008. If this court accepts Sharifan's testimony that his interest was valued at $24 million at the time of alleged breach, then this conclusively negated the existence of any damages because the difference between the contract price and the market value would be negative. Yazdani further contends that if this court rejects the $24-million figure as conclusory or speculative, then there is no competent evidence establishing damages in any amount at all. Either way, Yazdani asserts that he is entitled to rendition of judgment in his favor.
Yazdani again relies on Miga v. Jensen ,[12] which involved the denial of a plaintiff employee's option to purchase stock from a defendant employer. 96 S.W.3d at 209. In Miga , the Court explained:
*834 Because [the defendant] breached the contract on the same day [the plaintiff] attempted to exercise his option, the correct measure of damages for [the defendant's] failure to perform on his promise is the traditional one: "the difference between the price contracted to be paid and the value of the article at the time when it should [have been] delivered...."
Id. at 215. Therefore, the correct measure of damages was the difference between the market value of the stock options and the contract price at the time set for delivery. Id. at 216.
Applying the Miga measure of damages makes sense where an option holder's exercise of his right to buy stock was rejected and no delivery of stock occurred. See Walden v. Affiliated Comp. Servs., Inc. , 97 S.W.3d 303, 328 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (maj. op. on reh'g) (applying Miga to "conclude damages in this case should be calculated based on the value of ACS stock on the first day after ACS's breach on which the option holders were entitled to receive their stock").[13] However, Miga does not control how damages should be measured in the instant context: where a limited partner breaches an oral purchase agreement to buy out another limited partner's interest by refusing to pay any part of a set contract price and where the seller already has relinquished his interest.[14]
Determining the proper method for measuring damages is a question of law, which we review de novo. See Allied Vista, Inc. v. Holt , 987 S.W.2d 138, 141 (Tex. App.-Houston [14th Dist.] 1999, pet. denied). We find cases in which the parties contracted for a set price for certain performance, and where the selling party fully performed but the buying party failed to pay any or all of the contract price, to be instructive with regard to the correct measure of damages here.
Our court has recognized that in an appropriate situation "the sum contracted for by the parties" may be an appropriate measure of damages. Eagle Fabricators, Inc. v. Rakowitz , 344 S.W.3d 414, 423 (Tex. App.-Houston [14th Dist.] 2011, no pet.). In Eagle Fabricators , a steel erector filed suit against a steel fabricator after the fabricator refused to pay the full amounts agreed to be paid for work by the erector on various construction projects. Id. at 418. The jury found that the fabricator breached the contracts first and awarded the erector damages where the jury was instructed to consider "[t]he sum contracted for by the parties." Id. at 418-19, 423. On appeal, we rejected the fabricator's argument that the contract price was the *835 wrong measure for damages. Id. at 423 (concluding it is "not the case" that contract price can never be appropriate measure of damages (citing McFarland v. Sanders , 932 S.W.2d 640, 644 (Tex. App.-Tyler 1996, no writ) ) ).
In Sacks v. Hall , an orthodontist brought a claim for breach of contract against his former patient, alleging that she had failed to fully pay for the orthodontic services provided. 481 S.W.3d at 244. The jury found that the patient breached the contract and returned a verdict in favor of the orthodontist. Id. On appeal, the patient challenged the damages award. The Sacks court explained that the correct measure of contract damages was the benefit of the bargain. Id. at 248-49. The Sacks court concluded that the trial court's definition of benefit of the bargain-"The difference, if any, between the value of the agreement [sic] between the value of orthodontic care agreed to by the parties and the value of the orthodontic care performed [by] [orthodontist]. The difference in value, if any, shall be determined at the time and place the orthodontic care was performed."-was erroneous because it focused on the value of the services performed by the plaintiff orthodontist, the nonbreaching party, instead of on the difference between the value actually received by him from the defendant patient, the breaching party, and the value the orthodontist expected to receive. Id. at 244, 248. Where the orthodontist expected to receive $5,995 from the patient under the contract and she only paid him $4,775, he suffered $1,220 in actual damages-the unpaid portion of the contract. Id. at 248. The Sacks court held the charge error was harmless where the jury awarded $1,220. Id. at 249.
In Synagro of Texas-CDR, Inc. v. AON Risk Services of Texas, Inc. , a commercial insurance broker sued its client company for breach of contract to collect the entirety of the amount the broker billed for the replacement insurance at issue and the value of its commission for obtaining the insurance. No.13-04-666-CV, 2007 WL 29387, at *1 (Tex. App.-Corpus Christi Jan. 4. 2007, pet. denied) (mem. op.). The jury found that the company breached its contract with its broker and awarded essentially the full unpaid contract amount requested as damages. Id. On appeal, the client challenged the damages award. The client argued that the proper measure of the broker's damages was its lost profits, not the contract price. Id. at *2. However, the Synagro court explained that "[w]hen a party performs a contract for which another party agreed to pay a certain sum of money, the party performing the contract may recover the contract price in a breach of contract action." Id. The Synagro court specifically noted that the contract price was the correct measure where "[the broker's] counterclaim and damages involved past performance that [the client] had already enjoyed, for which [the broker] was entitled to payment." Id.
Here, the parties negotiated back and forth over the contract price for Sharifan's forty-percent limited-partnership interest in terms of precisely what Yazdani was willing to pay for it and what Sharifan was willing to receive for it. In August 2008, the parties negotiated a price of $12.5 million as the value of Sharifan's limited-partnership interest. There was evidence that the parties agreed that the $12.5-million figure for Sharifan's interest was "fair" and "a good return." Sharifan recognized that he sold his interest to Yazdani for what could be considered a lower price; however, he wanted out because the relationship had "become really unbearable" and "[his] health is [worth] more than that."
*836 The parties' chosen method of determining an appropriate price for a limited-partnership interest was contemplated in their very own partnership agreement. In section 11.3, "Purchase Price," the partnership agreement provided: "The Purchasers and Selling Partner shall endeavor to agree upon the value of the Partnership Interest of the Selling Partner.... The purchase price ("Purchase Price") payable for the Selling Partner's Partnership Interest shall be equal to 100% of the value of Selling Partner's Partnership Interest ... determined by agreement of the Partners." Any other value estimation of Sharifan's share of the partnership has little, if any, relevance where there is evidence of an agreed valuation by the parties.[15]
At trial, Sharifan's trial counsel offered this explanation of the measure of Sharifan's contract damages:[16]
The deal is the difference between what you were promised or represented you were going to get and what you actually get. What you actually got was zero, and he offered you 12 and a half million dollars for your shares. In that scenario the damages are the 12 and a half that you didn't get ....
In other words, Yazdani and Sharifan agreed on the value of Sharifan's interest and the contract purchase price of $12.5 million. Sharifan tendered his interest to Yazdani, and Sharifan's portion of the sale was complete, in August 2008. Yazdani never paid anything to Sharifan for his interest. Sharifan, the nonbreaching party, was promised and expected to receive $12.5 million for his interest and received $0. The difference between the value as represented (and expected to be received) and the value as received by Sharifan was $12.5 million.
Where Sharifan fully performed by delivering his forty-percent interest[17] in August 2008 and where Yazdani paid Sharifan $0 in return and had already enjoyed Sharifan's past performance,[18] Sharifan suffered the economic loss of the entire unpaid $12.5 million for the agreed-upon value of his interest. Considering the evidence in the light most favorable to, and indulging every reasonable presumption in favor of, the findings and judgment of the trial court, we conclude that there was legally sufficient evidence[19] to support Sharifan's $12.5 million in damages for Yazdani's breach of the August 2008 oral agreement.
We overrule Yazdani's second issue.
C. No waiver of enforcement
We next address Yazdani's fourth issue: "[w]hether Sharifan waived or is estopped from insisting upon enforcement *837 of the alleged oral agreement for the sale of his partnership interest." In his "argument" section, however, Yazdani only discusses waiver.[20] We conclude that the answer is no.
Yazdani contends that Sharifan's intentional conduct after learning of Yazdani's breach was inconsistent with claiming a right to enforcement. For example, Sharifan did not respond to Little's email containing the $7.5-million offer with "we had a deal for $12.5 million," but instead wanted to buy out Yazdani's almost-sixty-percent interest for $11 million. Then Sharifan continued to negotiate a sales price for his interest throughout 2009. In addition, Sharifan continued to act as a limited partner, requesting to examine and audit the partnership's books, and did not seek to enforce the buyout agreement.
Generally, "waiver" consists of the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. See Jernigan v. Langley , 111 S.W.3d 153, 156 (Tex. 2003) (per curiam). However, "[a] court should conclude a waiver occurred only when a party unequivocally manifested the intent not to assert her rights." Shannon v. Mem'l Drive Presbyterian Church U.S. , 476 S.W.3d 612, 627 (Tex. App.-Houston [14th Dist.] 2015, pet. denied). The defense of waiver ordinarily is a question of fact. Tenneco Inc. v. Enterprise Prods. Co. , 925 S.W.2d 640, 643 (Tex. 1996). Yazdani did not obtain favorable findings on waiver. Because Yazdani had the burden of proof on this affirmative defense, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. See Dow Chem. , 46 S.W.3d at 241.
Yazdani relies on Tenneco v. Enterprise Products , 925 S.W.2d at 643, where the Court concluded that the defendants conclusively demonstrated the affirmative defense of waiver as a matter of law. The plaintiffs brought various claims after the defendants transferred their ownership shares in a natural gas liquids fractionation plant. Id. at 641-42. The trial court granted summary judgment in favor of the defendants, the appellate court reversed, and the Supreme Court of Texas reversed the appellate court and rendered judgment for the defendants. Id. at 641, 644. There, the defendants presented evidence that the plaintiffs knew about the transfer; amended and ratified the operating agreement expressly with the defendant transferee; shared revenue with and permitted the defendant transferee to vote on issues requiring owner approval; and failed to complain for three years about the defendant transferee's lack of compliance with the operation agreement. Id. at 643-44.
In contrast, the evidence here did not conclusively establish that Sharifan through his words or conduct unequivocally intended to renounce his rights to enforce the August 2008 oral agreement. Shortly after Yazdani repudiated the deal, Sharifan engaged Slovacek as his attorney to pursue his rights under the $12.5-million "payment promise." Sharifan's continuing efforts throughout 2009 to sell his interest and resolve the parties' dispute do not constitute waiver as a matter of law. See Cal-Tex Lumber Co., Inc. v. Owens Handle Co., Inc. , 989 S.W.2d 802, 812-13 (Tex. App.-Tyler 1999, no pet.) ("[A] party's continuing performance after another party's breach is not a waiver of the right to recover damages due to the breach, and a non-breaching party's honest efforts to induce *838 the party in default to perform the contract do not constitute waiver" (citing Consol. Eng'g Co. v. S. Steel Co. , 699 S.W.2d 188, 191 (Tex. 1985) ) ); see also Walden , 97 S.W.3d at 322 (plaintiffs who insisted on performance where defendant refused to perform did not waive contract claims as matter of law (citing Consol. Eng'g , 699 S.W.2d at 191 ) ). Nor do Sharifan's efforts to protect what may have still been his right to access certain partnership records. As the trial court stated when it refused to direct a verdict in favor of Yazdani on Sharifan's contract claim: "There is a difference between asserting ownership rights and protecting the ownership rights that you may still have by virtue of someone not moving forward with a contract."
We overrule Yazdani's fourth issue.
D. The trial court's treatment of Yazdani's declaratory-judgment claim
We next consider Yazdani's fifth issue: "[w]hether-after finding that Sharifan failed to comply with a proper capital call and thus became a defaulting partner under the partnership agreement-the trial court erred in rendering judgment against Yazdani on his claim to declare the partnership interests owned by Yazdani and Sharifan." We conclude that these findings are not relevant where Sharifan fully performed and where Yazdani was declared the 100-percent owner.
Yazdani takes issue with the trial court's issuing declarations regarding the proper nature of his August 31, 2009 capital call and the need for readjustment of the partners' capital accounts because Yazdani chose to contribute Sharifan's share of the capital call,[21] but then declining to quantify the amount of those readjusted interests.[22] Yazdani also insists that he is entitled to an equitable accounting of Sharifan's limited-partnership interest.
However, we already have determined that the trial court's findings of fact and conclusions of law can be reconciled as not *839 awarding specific performance and that the court's money judgment in favor of Sharifan on his contract claim can properly stand as damages. The trial court found that Yazdani breached the August 2008 oral agreement and Sharifan fully performed such agreement in August 2008-Sharifan's contract claim did not depend on the determination of whether he forfeited or had a reduced partnership interest after that point. Anything Sharifan did afterward in response to the August 31, 2009 capital call and any subsequent readjustment of partnership interests could not have affected Yazdani's ownership of all the partnership interests.
Accordingly, the findings relating to Yazdani's request for a declaration (and inability to prove) that Sharifan forfeited or had a reduced partnership interest were immaterial and therefore harmless. See Castro , 2013 WL 1928742, at *5 ; Able , 725 S.W.2d at 780. There simply was no need for the trial court to readjust any interest that already had been relinquished to Yazdani by Sharifan. Nor was there any need for the trial court to order an accounting of such interest. Moreover, just as Yazdani requested, the trial court concluded and declared that he owned all of the interests in the partnership.
We overrule Yazdani's fifth issue.
E. Attorney's fees
We next address what is listed as Yazdani's seventh issue in his "Issues Presented"[23] -"[w]hether the trial court erred in awarding attorney's fees to Sharifan, and in refusing to award attorney's fees to Yazdani." We disagree.
Yazdani argues that the trial court's award of attorney's fees to Sharifan cannot stand because Sharifan was not the "prevailing party." However, we already have overruled Yazdani's issues regarding waiver and enforceability of the August 2008 oral agreement, specific performance, and contract damages. The trial court did not err in awarding Sharifan his attorney's fees. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2015).
In addition, Yazdani asserts that he is "entitled" to recover attorney's fees as "the only prevailing party" based on the declarations issued in his favor.[24] Although the trial court may award fees in any declaratory-judgment action where it determines the fees are equitable and just, Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2015), Yazdani does not explain how the trial court abused its discretion in choosing not to award any fees to him. To the extent Yazdani argues that he is entitled to attorney's fees because of the China Trip "offset," as an affirmative defense, see infra section IV.G, offset only applied to reduce Sharifan's award of contract damages and would not entitle Yazdani to any fees.
We overrule Yazdani's seventh issue.
F. Prejudgment interest
We next consider Yazdani's eighth issue and Sharifan's related cross-issue. Yazdani argues that the trial court's award of prejudgment interest was an abuse of *840 discretion because there was no legal basis for such award and because the award was excessive. Sharifan argues that the trial court miscalculated the award of prejudgment interest by using the wrong start date of when Sharifan filed suit. Neither Yazdani nor Sharifan is correct.
"[T]he purpose of pre- and postjudgment interest is to fully compensate the injured party and ... such interest represents additional damages for lost use of the money due as damages." Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C. , 522 S.W.3d 471, 482 (Tex. App.-Houston [14th Dist.] 2016, pet. denied). The trial court has discretion to award prejudgment interest as governed by equitable principles. Hand & Wrist Ctr. of Houston, P.A. v. Republic Servs., Inc. , 401 S.W.3d 712, 717 (Tex. App.-Houston [14th Dist.] 2013, no pet.).
Yazdani essentially challenges the award of prejudgment interest on the basis that the trial court awarded Sharifan specific performance instead of contract damages. However, we already have upheld the trial court's judgment awarding Sharifan $12.5 million as monetary damages resulting from Yazdani's breach of the August 2008 oral agreement. Yazdani further contends nobody testified that the parties agreed to pay prejudgment interest. For the trial court to be able to award prejudgment interest sought in equity based on a common-law claim, the plaintiff must specifically request it in his pleading, which Sharifan did here. See DeGroot v. DeGroot , 369 S.W.3d 918, 926 (Tex. App.-Dallas 2012, no pet.). Yazdani has not cited nor have we located any authority also requiring that parties to an oral agreement must agree on the availability of prejudgment interest to recover it on an award for breach of contract.
Yazdani next alternatively argues that the prejudgment award is excessive because it "should be based only on the amount of contract damages and offset by the value of Sharifan's retained partnership interest." We note that Yazdani did not raise this particular offset argument in his motion for new trial. In any event, Yazdani was not entitled to any equitable offset tied to Sharifan's retention of any interest where the trial court found that Sharifan fully tendered his partnership interest to Yazdani in August 2008.
In his motion for new trial, Yazdani did challenge the trial court's failure to offset for periods of delay not caused by him when it calculated prejudgment interest. Yazdani points to Sharifan's piecemeal case presentation and the trial court's long delay in signing final judgment. Where prejudgment interest is awarded based on common-law equitable principles, however, a trial court may not reduce or eliminate a plaintiff's prejudgment interest award because of delays in resolving a case. See Matthews v. DeSoto , 721 S.W.2d 286, 287 (Tex. 1986) (per curiam).
Under circumstances where the trial court found that Yazdani breached the August 2008 oral agreement by not paying Sharifan any amount of the promised $12.5 million in exchange for Sharifan's already-delivered partnership interest, and described Yazdani's conduct in connection with the August 31, 2009 capital call as "manipulative" and "suspicious," we cannot conclude that the trial court abused its discretion in choosing to award Sharifan equitable prejudgment interest. See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc. , 962 S.W.2d 507, 533 (Tex. 1998) (plaintiff was entitled to recover prejudgment interest on its breach-of-contract award).
We overrule Yazdani's eighth issue.
*841 In his first cross-issue,[25] Sharifan contends that the trial court abused its discretion when it decreased the amount of prejudgment interest to run from the date of Sharifan's lawsuit. Sharifan argues that the trial court should have set prejudgment interest to run from April 21, 2009, 180 days after Yazdani's Fulbright attorneys "rejected Sharifan's request for confirmation of payment on the $12.5 million."
Prejudgment interest accrues beginning on the 180th day after the defendant receives written notice of the claim or on the date suit was filed, whichever occurs first. Id. at 531. "A 'claim' is 'a demand for compensation or an assertion of a right to be paid.' " Id. The letter relied on by Sharifan, dated October 21, 2008, from Fulbright to Slovacek referenced the Fulbright attorney's "understanding that [Slovacek's] client, Mr. Abdee, has expressed a desire to sell his interest in [MHP]." The letter further stated Slovacek told the Fulbright attorney by email that he was "not authorized to engage in a discussion without a written confirmation of the payment promise of $12,500,000." The Fulbright attorney disputed that Yazdani " 'promised' or agreed to provide any amount at this time to purchase your client's interest in the partnership" but "believe[d] that it is in each party's interest to engage in an expeditious and confidential proceeding to value and potentially separate" Sharifan's interest in MHP.
Nothing in this letter either notified Yazdani or confirmed notification by Yazdani that Sharifan was demanding compensation or asserting a right to be paid. Knowledge that Sharifan would not engage in a discussion without written confirmation of the "payment promise" does not constitute knowledge that Sharifan demanded payment on such promise. The Fulbright letter was not "written notice of a claim." Compare Fleming & Assocs., L.L.P. v. Barton , 425 S.W.3d 560, 576-77 (Tex. App.-Houston [14th Dist.] 2014, pets. denied) (email requesting other party to contract to take "closer look" and requesting that parties in their best interest "sit down and discuss" issues was not written notice of claim), with id. at 576 (email stating other party breached contract and clearly owed and was wrongfully withholding set amount was written notice of claim). We conclude that the trial court did not abuse its discretion when it altered the start date for prejudgment interest to December 16, 2009.
We overrule Sharifan's first cross-issue.
G. $135,000 offset
In Sharifan's second cross-issue, he argues that the trial court erred in awarding Yazdani a $135,000 offset against the $12.5-million damages award. First, Sharifan contends because the trial court found that the evidence relating to Sharifan's China Trip did not rise to the level of fraud, conversion, or breach of fiduciary duty by Sharifan, Yazdani had no justifiable basis or any legal claim for recovery of the $135,000. We disagree. In addition to affirmative claims, Yazdani pleaded the affirmative defense of offset, alleging that Sharifan's claims were "barred, in whole or in part, by offsets to which Plaintiffs/Counter-Defendants are entitled as the result of partnership funds paid to, or at the direction of, Sharifan that were not for the benefit of the partnership." See Brown v. Am. Transfer & Storage Co. , 601 S.W.2d 931, 936 (Tex. 1980) ; Brant Oilfield Mgmt. & Sales, Inc. v. Mountwest, Inc. , No. 14-15-00240-CV, 2016 WL 3574669, at *3 (Tex. App.-Houston [14th Dist.] June 30, 2016, no pet.)
*842 (mem. op.) ("The right to an offset or reduction in contract price is an affirmative defense.").
Sharifan further contends that the trial court improperly shifted the burden of proof to Sharifan. Again, we disagree. Yazdani presented evidence that the partnership in 2007 transferred at least $160,000 into a Bank of China account, which was a partnership account that Sharifan requested be opened and of which Sharifan exercised control. Under section 6.2 of the partnership agreement, "Bank Accounts; Investments," these funds were only to be withdrawn in furtherance of a partnership purpose or to pay partnership debts. Sharifan does not otherwise challenge the trial court's findings that: Sharifan took three trips to China in 2007 and 2008; Sharifan opened a Bank of China account in his name that was the partnership's account for the benefit of the partnership; the partnership transferred significant sums of money into the partnership account; despite Yazdani's repeated requests, Sharifan never fully or accurately accounted to the partnership for the money transferred into the account; Sharifan admitted using portions of the funds for his personal use; and "there is $135,000 in excess funds advanced to Sharifan in connection with the so-called 'China Trip[,]' [which] amount should be reimbursed to the Partnership." We conclude that Yazdani met his burden to show the defense of offset.
Next, Sharifan assails the $135,000 offset related to the China Trip because Yazdani individually lacked standing to bring any claims against Sharifan for a wrong done to the partnership MHP. The pleadings reflect that Yazdani, MHM, and MHP asserted the affirmative defense of offset against Sharifan's claims. The trial court found that the amount of $135,000 "should be reimbursed to the Partnership" and concluded that "Plaintiffs are entitled to recover the sum of $135,000 on its [sic] claims for reimbursement of excess funds advanced to Sharifan in connection with the so-called 'China Trip.' ... Such amounts shall be offset against any affirmative relief awarded to Sharifan." In its amended final judgment, the trial court stated that "Plaintiffs are entitled to recover the sum of $135,000 on its [sic] claims for reimbursement of excess funds advanced to Sharifan in connection with the so-called 'China Trip.' Such amounts shall be offset against any affirmative relief awarded to Sharifan." Per the judgment, these "plaintiffs" included all of Yazdani, MHM, and MHP. Sharifan, however, has not brought a cross-appeal against MHM or MHP and does not attack MHM's or MHP's standing with regard to the "offset." Nor has Yazdani, MHM, or MHP challenged the trial court's treatment of the "offset" in its judgment. Under these circumstances, we will not disturb the trial court's judgment awarding Sharifan damages as reduced by an offset of $135,000.
We overrule Sharifan's second cross-issue.
V. CONCLUSION
Having denied the parties' post-submission motions carried with the case, and having overruled all of Yazdani's issues and Sharifan's cross-issues, we affirm the trial court's judgment.[26]

Little was the attorney who drafted the partnership agreement.

MHP and MHM are not parties to this appeal or cross-appeal.

Yazdani also alleged breach of the partnership agreement, conversion, fraud, breach of fiduciary duty, and negligent misrepresentation. These claims are not at issue on appeal.

Sharifan also alleged breach of settlement agreement(s), as well as fraud and breach of fiduciary duty. These claims are not at issue on appeal.

After Yazdani filed a motion to modify, correct, or reform final judgment, the trial court amended its original final judgment to change the start date of prejudgment interest from August 13, 2008, to December 16, 2009.

The Kramer Court outlined nonexclusive factors that inform the inquiry, including:
• whether acceptance of benefits was voluntary or was the product of financial duress;
• whether the right to joint or individual possession and control preceded the judgment on appeal or exists only by virtue of the judgment;
• whether the assets have been so dissipated, wasted, or converted as to prevent their recovery if the judgment is reversed or modified;
• whether the appealing party is entitled to the benefit as a matter of right or by the nonappealing party's concession;
• whether the appeal, if successful, may result in a more favorable judgment but there is no risk of a less favorable one;
• if a less favorable judgment is possible, whether there is no risk the appellant could receive an award less than the value of the assets dissipated, wasted, or converted;
• whether the appellant affirmatively sought enforcement of rights or obligations that exist only because of the judgment;
• whether the issue on appeal is severable from the benefits accepted;
• the presence of actual or reasonably certain prejudice; and
• whether any prejudice is curable.
508 S.W.3d at 228-29 (footnotes omitted).

For the most part, Sharifan relied on the challenged declarations as support for how he would suffer prejudice from Yazdani's appeal.

The parties do not dispute that the statute of frauds does not apply to the August 2008 oral agreement.

Yazdani argues that another "unresolved term" in the August 2008 oral agreement was "how Sharifan would release his claims against the partnership." In his opening brief, Yazdani provides no separate argument or analysis regarding this missing term. In any event, the fact that this term may have been addressed in later exchanged written drafts after the parties engaged representation to resolve their dispute over the August 2008 oral agreement does not prove that it was material and essential at the time.

Yazdani points to the following findings of fact:
31. Despite the significant bookkeeping and accounting irregularities, the credible evidence leaves little doubt that during 2008 and 2009, the Hotel was experiencing significant financial difficulties. There were continual shortages of funds sufficient to make payroll and to pay ordinary operating expenses. Thus, although Yazdani never establish[ed] a formal "Reserve Fund," the August 31, 2009 capital call was a proper capital call under the Partnership Agreement.
32. Sharifan chose not to contribute his proportionate share of the August 31, 2009 capital call and thereby became a "defaulting Partner" under Section 4.4 of the Partnership Agreement.
33. Yazdani properly contributed Sharifan's proportionate share of the August 31, 2009 capital call and properly elected to treat that contribution as additional capital of the partnership under Section 4.4 of the Partnership Agreement.
34. Under Section 4.4 (A) of the Partnership Agreement, the Partners' Capital Accounts were required to be adjusted because Yazdani elected to treat his additional contribution as additional capital of the partnership.

According to Yazdani, a party only may seek specific performance to enforce a stock-purchase agreement where a closely-held corporation's stock has no ascertainable market value, see Enzo Invs., LP v. White , 468 S.W.3d 635, 649 (Tex. App.-Houston [14th Dist.] 2015, pet. denied).
The trial court issued these pertinent fact findings:
25. The limited Partnership held only one asset, a hotel with a parking lot sitting on a fee-simple interest in real estate. As the minority partner, Sharifan did not have any right to liquidate the Partnership, or force a buyout, or freely alienate his interest to a third party. Sharifan's limited Partnership interests were subject to a host of restrictions by the terms of the Partnership Agreement, including a right of first refusal to the other limited partners and the general partner, obtaining the consent of any other limited partners and the general partner before selling, as well as restrictions on transferability under the securities laws.
26. Under the limited Partnership Agreement, the sale of Sharifan's limited Partnership interest was restricted by a requirement that the shares be offered first to Yazdani. The restrictions on transferability are particularly restrictive in this case because the only other limited partner and the general partner are one in the same: Shab[ahr]am Yazdani-Beioky (including entities he controls). Thus, Yazdani's consent and approval would be necessary for any sale Sharifan attempted. Thus, the market value of the non-transferable, limited partnership interests was zero at the time of Yazdani's breach of the agreement to purchase Sharifan's limited Partnership interest.
27. Sharifan's limited partnership interest had no ascertainable market value. As such, essentially the fair market value of the interest is zero. Since the closely-held corporation's stock has no ascertainable market value or it was zero, Sharifan was entitled to seek specific performance to enforce a purchase agreement.
28. In this unique case, the value of the limited Partnership interests are impossible to ascertain and are subject to the financial whims of Yazdani as the only buyer in the market for these interests with full control over the value (or lack thereof) in the capital accounts.
29. In addition, the Court could not rely on the Partnership books and records as maintained by Yazdani. For instance, Yazdani directed the General Partner to comingle the Partnership's books and records with the books and records of Victorian Properties, LLC which is a separate legal entity not owned not by the Partnership but rather owned by Yazdani individually. Other examples are listed below but the end result is that such a unique Partnership arrangement with such expansive powers left to the General Partner further limited the marketability of Sharifan's limited partnership interest to result in no ascertainable market value. There were no willing purchasers for these non-controlling interests other than Yazdani. Due to the restrictions on the sale of the closely-held limited Partnership interests of Sharifan, arguably the fair market value of the interests is zero.
30. Market value is what a hypothetical reasonable willing buyer under no compulsion to buy would pay to a hypothetical reasonable willing seller under no compulsion to sell. With knowledge of the facts, no reasonable third-party under no compulsion to buy would have paid anything for Sharifan's position in August 2008. The only buyer for Sharifan's interest in August 2008 was Yazdani. Because the Court finds the value of Sharifan's interests are impossible to ascertain, the only appropriate remedy is to specifically enforce the terms of the breached agreement.

In a letter submitted post submission, Yazdani relies on Allen-Pieroni v. Pieroni , 535 S.W.3d 887 (Tex. 2017) (per curiam). Allen-Pieroni , however, involved the proper measure of damages in a slander-of-title case where the plaintiff seller owned the property at issue and suffered a lost sale, not in a breach-of-contract case where the plaintiff seller's interest already had passed to the defendant buyer per their oral purchase agreement but the seller never received any of the agreed contract price for his interest. Id. at 889 ("[I]n a case in which the plaintiff still owns the property at the time of trial, the amount of actual damages caused by the slander is generally the difference between the contract price (the amount the plaintiff would have received but for the defendant's title disparagement) and the property's market value at the time of trial with the cloud removed.").

A "stock option" is "[a]n option to buy or sell a specific quantity of stock at a designated price for a specific period regardless of shifts in market value during the period" or "[a]n option that allows a corporate employee to buy shares of corporate stock at a fixed price or within a fixed period." Black's Law Dictionary 1644 (10th ed. 2014). In order to restore the plaintiff option holder to the economic position that he would have been in without the breach (the failed exercise of the option), it makes sense to consider the stock's market value as of the time. The option holder only would be able to show damages if the market value of the stock at the time of breach were higher than the price set in the stock option because otherwise she would not have suffered any damages; instead, she could have chosen to not exercise her stock option.

Miga did not address damages in the opposite scenario-if the plaintiff instead were the employer who fully performed by delivering the stock on the exercise of the option and if the defendant were the employee who paid nothing or less than agreed for the stock. Presumably, benefit-of-the-bargain damages in that situation would be the difference between the contract price (what the plaintiff expected to be paid) and the amount actually received from the defendant.

Under section 11.3 of the partnership agreement, there would only need to be a determination of the "then fair market value" of the partnership interest to be sold through an appraisal process where the parties were first unable to agree on such value.

We disagree with Yazdani that Sharifan did not raise this method of calculating damages in the trial court.

Although he denied the August 2008 oral agreement, Yazdani does not dispute that at the time Sharifan owned a forty-percent limited-partnership interest in MHP.

Although he claims it was due to Sharifan's missed capital call and not to any oral agreement, Yazdani does not dispute the trial testimony that he was the sole owner of interests in the hotel and that partnership tax and other documents no longer listed Sharifan as a limited partner.

Although Yazdani refers to factual sufficiency within his sixth issue in his "Issues Presented," see infra n.23, he only requests rendition in connection with his "specific-performance and contract-claim issues against Sharifan."

Estoppel and waiver are distinct doctrines. See Ulico Cas. Co. v. Allied Pilots Ass'n , 262 S.W.3d 773, 778 (Tex. 2008).

See supra n.10.

The trial court also issued the following findings on Yazdani's declaration request:
35. The burden was on Yazdani to establish by preponderance of the credible evidence the proper values in the adjusted Partners' Capital Accounts and the adjustment of the Partners' Percentage Interests flowing from Yazdani's Section 4.4 (A) election. Yazdani has failed to carry such burden by a preponderance of the credible evidence. For example, and not by way of limitation, the evidence in this case raises serious doubts and concerns regarding the reliability, accuracy and maintenance of the partnership books and records. It was suspect in many respects. As such, the Court is unable to declare the proper values in the Partner's Capital Accounts or each adjusted Partner's Partnership Interests.
...
38. The Court is simply unable to declare that Sharifan forfeited his prior Partnership Interest or exactly what his adjusted Partnership Interest might have been (even assuming there hadn't been a prior agreement to sell his stock to Yazdani in August of 2008). In addition, the Court notes that while the PA calls for the adjustments of the Partners' Percentage Interests, it is totally silent with regard to "forfeiture" of a partner's interest. Moreover, the Court cannot ignore the suspicious timing of Yazdani's election to treat his contribution as additional capital under Section 4.4. While he may have had a technical right to do so, there is credible evidence that he timed it for the purpose of eliminating Sharifan as a partner. At the time, the parties seemed to be close to resolving their outstanding claims and differences via a buy-sell agreement in which Yazdani would obtain all of Sharifan's interests. Further, Yazdani was in unique position to manipulate the accounting to reach a mathematical and accounting equation necessary to reduce Sharifan's interest to zero or less under the PA. In short, without a proper and reliable accounting, it is simply impossible to tell.

Yazdani's sixth issue listed in his "Issues Presented" challenges whether the trial court's fact findings and conclusions of law are supported by legally and factually sufficient evidence. Yazdani does not include a separate argument section addressing this specific issue, but rather incorporates his challenges to the court's findings and conclusions within his other issues and argument sections. We address and otherwise overrule them accordingly.

Yazdani did not prevail on any remaining affirmative claim based on breach of the partnership agreement.

This cross-issue is listed first in Sharifan's "Issues Presented" but discussed second in his cross-appeal argument section.

Because we affirm the trial court's judgment, we do not reach Sharifan's conditional issues. See Tex. R. App. P. 47.1.